# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TEXARKANA DIVISION

MARY MARGARET MATHIS, individually     §
and as Administrator of the ESTATE OF    §
HOLLY BARLOW-AUSTIN; and MICHAEL  §
GLENN AUSTIN, individually,[1]          §
                                        §
           Plaintiffs,                  §     CIVIL ACTION NO.:
                                        §
v.                                      §     **JURY TRIAL DEMANDED**
                                        §
SOUTHWESTERN CORRECTIONAL, LLC  §
d/b/a LASALLE CORRECTIONS, LLC and   §
LASALLE SOUTHWEST CORRECTIONS;   §
LASALLE MANAGEMENT COMPANY,       §
LLC; BOWIE COUNTY, TEXAS;           §
TIMOTHY REYNOLDS, M.D., individually;  §
STEVEN FOLTZ, individually; JAMES     §
MCCANN, individually; MICHELLE        §
ARNOLD, individually; TIFFANY HILL;    §
individually; MARKESHA JONES,         §
individually; A. HUGHES, individually; B.  §
CERY, individually; and JOHN and JANE  §
DOES 1-10.                             §
                                        §
           Defendants.                  §
                                        §

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

[1] Plaintiffs recognize that under Texas state wrongful death law, if no individual family members have filed suit within three months after their loved one's death, the administrator of the estate is the proper plaintiff to pursue the case on behalf of the eligible beneficiaries. *See* Tex. Civ. Prac. & Rem. Code Ann § 71.004(c). Because some jurisdictions require individual plaintiffs to be named in the lawsuit, in federal civil rights cases involving a wrongful death, plaintiffs are naming them here—in addition to the estate's administrator. Should the Court later determine that the estate's administrator is the only proper party to pursue the case on behalf of eligible beneficiaries, plaintiffs will voluntarily dismiss the individually named plaintiffs.

1

## I.     INTRODUCTION

1.     This is a civil rights action under 42 U.S.C. § 1983 arising from events that happened during the confinement of Holly Barlow-Austin at the Bi-State Justice Center Jail and a related facility, known as the Annex, which are run by the same private, for-profit correctional healthcare corporation: LaSalle Corrections. The immediate events that give rise to this lawsuit began on April 5, 2019 and culminated in the senseless death of Holly Barlow-Austin on June 17, 2019. Defendants caused her death by flagrantly violating her rights under both the Eighth and Fourteenth Amendments to the United States Constitution.

2.     Defendants' unconstitutional actions include denying Holly Barlow-Austin vital prescription medication, failing to monitor and treat her life-threatening medical needs, failing to transport her to the hospital until it was too late to save her life, housing her in deplorable and inhumane conditions of confinement, depriving her of water, forcing her to endure extreme and pointless pain and suffering, causing her death, and robbing her surviving family members of their relationship with her.

3.     What happened to Holly-Barlow Austin was not an isolated incident. She is just the latest victim of a greedy corporate culture that sees inmates as dollar signs and puts profits over people's lives. For years, LaSalle has been neglecting and abusing inmates, disregarding their fundamental constitutional rights, and engaging in other cruel and inhumane acts and practices. Despite the needless deaths of multiple United States citizens, LaSalle refuses to fix the systemic constitutional deficiencies that keep causing them. So long as the corporation continues to profit, nothing changes. This case goes to the very heart of everything that's wrong with the privatization of America's county jails.

## II.     JURSIDCTION AND VENUE

4.      This Court has original subject matter jurisdiction over the plaintiffs' civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

5.      This Court has personal jurisdiction over each of the named defendants because they either (1) reside in this judicial district, or (2) have sufficient minimum contacts in the State of Texas, and the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

6.      Venue is proper in this jurisdiction, under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and/or because all defendants are subject to this Court's personal jurisdiction in this action.

## III.     PARTIES

A.     <u>Plaintiffs</u>

7.      Plaintiff Mary Margaret Mathis is a United States Citizen and resident of Texarkana, Arkansas. She is the surviving mother of the decedent, Holly Barlow-Austin. She is also the court-appointed Administrator of the Estate of Holly Barlow-Austin, which was duly formed under Texas law. She is a plaintiff in her individual capacity and in her representative capacity as the Administrator of her daughter's estate. In her representative capacity, she is pursuing this action for the benefit of all eligible statutory beneficiaries, including herself and her daughter's surviving spouse.

8.      Plaintiff Michael Glenn Austin is a United States Citizen and resident of Texarkana, Texas. He is the surviving spouse of Holly Barlow-Austin.

B.     **Defendants**

    1.     **The Municipal Defendant**

    9.     Defendant Bowie County is a governmental entity and a political subdivision of the State of Texas and is a "person" for purposes of 42 U.S.C. § 1983. Bowie County is responsible for operating the Bi-State Justice Center Jail ("Bi-State Jail"), which sits on the border of Texas and Arkansas in Texarkana and is physically located on both sides of the state line. Bowie County is also responsible for operating a related facility, known as the Annex, which sits on the Texas side of the border. All Bi-State Jail and Annex inmates are entitled to constitutional protections under the Eighth and Fourteenth Amendments, including the right to constitutionally adequate medical care. Bowie County has a non-delegable duty to ensure that the Bi-State Jail and the Annex meet constitutional mandates. Bowie County may be served via its County Judge, the Honorable James Carlow, at 710 James Bowie Drive, New Boston, Texas 75570.

    10.     In February 2013, and as periodically renewed thereafter, Defendant Bowie County contracted with a private, for-profit correctional corporation, known as Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC, to run all aspects of the Bi-State Jail and the Annex, including the provision of medical care to the jail's population of pretrial detainees and post-conviction prisoners. Pursuant to the contract, Bowie County is obligated to conduct monthly inspections of the Bi-State Jail. Although Defendant Bowie County sought to privatize the operation of their jail by delegating its final policy-making authority to Southwestern Correctional, LLC, it cannot contract-away its constitutional obligations and is liable for any unconstitutional corporate customs or policies that resulted in harm to any detainees and inmates confined in the jail.

### 2.     The Corporate Defendants

11.     Defendant Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC and LaSalle Southwest Corrections (hereinafter "LaSalle"), is a Texas Limited Liability Company doing business in this judicial district for purposes of profit. LaSalle is considered a "person" under 42 U.S.C. § 1983. LaSalle manages the day-to-day operations of the Bi-State Jail and the Annex. LaSalle is a final policymaker for Bowie County for purposes of providing jail-related services and meeting the needs of its pretrial detainees and convicted inmates. According to the Texas Secretary of State, LaSalle's registered agent is Tim Kurpiewski at 26228 Ranch Road 12, Dripping Springs, Texas 78620. At all material times, this defendant was acting under color of state law. Regardless of its place of residence, the allegations against this defendant arise from its actions in the state of Texas and in this judicial district.

12.     Defendant LaSalle Management Company, LLC ("LaSalle Management") is a Louisiana Limited Liability Company doing business in this judicial district for the purpose of profit. LaSalle Management is considered a "person" under 42 U.S.C. § 1983 and is the parent company of LaSalle. It is responsible for ensuring that its subsidiary meets its constitutional obligations in running the Bi-State Jail and the Annex. Because LaSalle Management does not maintain a registered agent in the State of Texas, it may be properly served through the Texas Secretary of State via certified mail at Secretary of State, P.O. Box 12079, Austin, Texas 78711. The Texas Secretary of State is then requested to forward service to LaSalle Management's registered agent in Louisiana: William K. McConnell, 192 Bastille Lane, Suite 200, Ruston, Louisiana 71270. At all material times, this defendant was acting under color of state law.

Regardless of its place of residence, the allegations against this defendant arise from its actions in the state of Texas and in this judicial district.

### 3.    The Individual Defendants

13.    Defendant Timothy Reynolds, M.D. is a United States Citizen who, on information and belief, resides in Texas. Defendant Reynolds was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing correctional medical care to inmates, including Holly Barlow-Austin. At all material times, Defendant Reynolds was a policymaker for LaSalle and was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from his actions in the state of Texas and in this judicial district.

14.    Defendant Steven Foltz is a United States Citizen who, on information and belief, resides in Texas. Defendant Foltz was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing correctional medical care to inmates, including Holly Barlow-Austin. At all material times, he was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from his actions in the state of Texas and in this judicial district.

15.    Defendant James McCann is a United States Citizen who, on information and belief, resides in Texas. Defendant McCann was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing correctional medical to care inmates, including Holly Barlow-Austin. At all material times, he was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from his actions in the state of Texas and in this judicial district.

16.     Defendant Michelle Arnold is a United States Citizen who, on information and belief, resides in Texas. Defendant Arnold was an employee of Defendant LaSalle and was responsible for providing correctional medical care to inmates, including Holly Barlow-Austin. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the state of Texas and in this judicial district.

17.     Defendant Tiffany Hill is a United States Citizen who, on information and belief, resides in Texas. Defendant Hill was an employee of Defendant LaSalle and was responsible for providing correctional medical care to inmates, including Holly Barlow-Austin. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the state of Texas and in this judicial district.

18.     Markesha Jones is a United States Citizen who, on information and belief, resides in Texas. Defendant Jones was an employee of Defendant LaSalle and was responsible for providing correctional medical care to inmates, including Holly Barlow-Austin. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the state of Texas and in this judicial district.

19.     Defendant A. Hughes (first name unknown) is a United States Citizen who, on information and belief, resides in Texas. Defendant Hughes was an employee of Defendant LaSalle and was responsible for providing correctional medical care to inmates, including Holly Barlow-Austin. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the state of Texas and in this judicial district.

20.     Defendant B. Cery (first name unknown) is a United States Citizen who, on information and belief, resides in Texas. Defendant Cery was an employee of Defendant LaSalle and was responsible for providing correctional medical care to inmates, including Holly Barlow-Austin. At all material times, she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the state of Texas and in this judicial district.

21.     Defendants John and Jane Does 1-10 are United States Citizens who reside in either Texas or Arkansas. These defendants (whose identities are unknown) were agents, employees, and/or subcontractors of Defendant LaSalle and were responsible for providing medical care and/or other jail-related services to inmates, including Holly Barlow-Austin. At all material times, they were acting under color of state law. Regardless of their places of residence, the allegations against these defendants arise from their actions in the state of Texas and in this judicial district.

### IV.     FACTUAL ALLEGATIONS

#### A.     <u>Facts Applicable to All Defendants</u>

22.     In early 2019, Holly Barlow-Austin resided in Texarkana, Texas, with her husband, Mike Austin. She was 46 years old. Like over one million other Americans, Ms. Barlow-Austin was living with Human Immunodeficiency Virus (HIV). She also suffered from depression and bipolar disorder and was undergoing treatment for substance addiction.

23.     Among other prescription medications, Ms. Barlow-Austin was taking Triumeq, which is a fixed-dose combination of three meds used to treat HIV/AIDS. She was also taking Fluconazole, a medication used to treat and prevent potentially deadly fungal infections, including cryptococcal meningitis, as well medications for her mental health needs.

24.     On the night of April 5, 2019, the Texarkana, Texas Police Department (TTPD) showed up at the home of Ms. Barlow-Austin, arrested her for a probation violation, and took her to the Bi-State Jail, which is run by LaSalle. She was thereafter confined in the Bi-State Jail and the Annex as a pretrial detainee and was entitled to all protections afforded to her under the Fourteenth Amendment to the United States Constitution, including the right to adequate medical care and humane conditions of confinement.[2]

25.     The following morning, on April 6, 2019, Ms. Barlow-Austin underwent an intake medical screening. Her blood pressure was 118/73, which is ideal. She had no abnormal vital signs, no reported headaches, no nausea or vomiting, no vision problems, no dizziness, no neck pain or stiffness, no numbness or weakness in her arms or legs, and no difficulty standing or walking. She was able bodied, hydrated, and well nourished.

26.     Later that day, the intake nurse faxed a request for information to Ms. Barlow-Austin's outside medical provider, the Texarkana Care Clinic, to acquire information about her medical conditions and current medications. The LaSalle medical staff did not receive a response until May 13, 2019, five weeks later, and did nothing to follow up on the missing information during that time.

27.     On April 8, 2019, Ms. Barlow-Austin's husband brought her prescription medications to the Bi-State Jail. The meds he brought included Triumeq (for HIV/AIDS), Fluconazole (to treat and prevent fungal infections), Quetiapine (for her bi-polar disorder), and Citalopram (for her depression). He personally presented his wife's medications to the LaSalle

---

[2]  If, at any time during her confinement, Ms. Barlow-Austin became convicted prisoner, she was entitled to all of the protections afforded to her under the Eighth Amendment to the United States Constitution, including the right to adequate medical care and humane conditions of confinement.

medical staff. They were in properly labeled bottles—with the name of the prescribing physician and issuing pharmacy—and showed active prescriptions. A LaSalle nurse wrote down the information and took the bottle of Triumeq, which contained approximately 25 pills.

28.     The Triumeq prescription alerted the LaSalle medical staff that Ms. Barlow-Austin was HIV-positive, and jail medical administration records also show their knowledge of her HIV-positive status. The Fluconazole prescription alerted them that she was susceptible to fungal infections. And the other meds alerted them of her mental health needs.

29.     Despite her husband bringing in her four prescription medications on April 8, 2019, Ms. Barlow-Austin did not receive any medication until April 12, 2019, when she received only two of her prescription meds, Citalopram and Triumeq, and she was given no medication whatsoever on the following two days. Moreover, she was not given any Fluconazole until April 17, 2019, nine days after her husband brought the prescription medication bottles into the jail. The Texas Commission on Jail Standards later cited the jail for its failure to dispense her medications as prescribed. Indeed, depriving her of these prescription medications put her at substantial risk of HIV/AIDS-related complications, including deadly fungal infections.

30.     As a result of the denial/delay of her prescription medications, Ms. Barlow-Austin became predictably sick. On April 13, 2019, she submitted a medical request form, also known as a kite, in which she reported multiple concerning symptoms, including a headache, dizziness, and a knot on her neck.

31.     The following day, April 14, 2019, Ms. Barlow-Austin reported to a LaSalle nurse that she was feeling hot and that her head was hurting. She also reported a swollen lump on the right side of her neck. During the visit, her blood pressure was 134/83, which is on the high end

of normal and higher than it was at intake. Toward the end of the visit, she told the nurse that she was unable to move her left leg. She was placed in a medical observation cell.

32.     Later that day, the LaSalle medical staff collected blood from Ms. Barlow-Austin and sent it to a lab. Among the things tested was her CD4 count, which measures the number of T cells (or white blood cells). These blood cells are crucial to fighting infection and safeguarding a person's immune system. A normal CD4 range is about 500-1,500. Ms. Barlow-Austin's results came back on April 17, 2019 and showed that her CD4 count was 87, indicating that her immune system was severely compromised.

33.     Due to her known HIV-positive status and her dangerously low CD4 count, Ms. Barlow-Austin was uniquely susceptible to life-threatening infections, such as fungal meningitis. It was incumbent on the jail medical staff to formulate a comprehensive medical plan to address her chronic and serious medical needs. This is particularly true given the symptoms she reported on April 13th and 14th. But LaSalle undertook no such planning.

34.     On April 17, 2019, the jail medical staff finally gave Ms. Barlow-Austin her anti-fungal prescription, Fluconazole, which they had known about since at least April 8, 2019, when her husband brought the medication in. On that same day, they also gave Ms. Barlow-Austin her bi-polar medication for the first time since her confinement began.

35.     Between April 18 and April 23, 2019, Ms. Barlow-Austin's husband visited his wife several times. During this time, she was being confined in the Annex, where LaSalle had transferred her. The Annex is walking-distance from the Bi-State jail and is also run by LaSalle. On each of these three visits, Ms. Barlow-Austin complained to her husband that she was suffering from a painful headache.

36.     On April 30, 2019, Ms. Barlow-Austin's husband went to visit her again at LaSalle's Annex facility. It was clear to him that her condition was deteriorating. During the visit, she not only complained of a bad headache, but she also complained of neck pain and other medical problems.

37.     That same day, Ms. Barlow Austin told the jail staff that her legs were numb. She also reported dizziness, head and neck pain, and had a half-dollar-sized knot on the right side of her neck. Guards took her to the medical office in a wheelchair. During the visit, she described her pain to a LaSalle nurse as a 10/10 all over her back and neck. In addition, her tonsils were swollen, and her blood pressure was 154/92, which is high and substantially higher than her baseline blood pressure at intake.

38.     Hours later, Ms. Barlow-Austin was again taken to the medical office, where she told a LaSalle nurse that her left leg had gotten weaker. Her blood pressure was still high, this time measuring 156/85. In response to her symptoms, LaSalle should've arranged for her to be seen by a medical doctor. But this didn't happen. Nor was she given any medication for her successive high blood pressure readings.

39.     The following day, on May 1, 2019, Ms. Barlow-Austin saw a LaSalle RN, who was aware of her complaints from the previous day. During this visit, her blood pressure was 162/85, which is high. Instead of arranging for her to be seen by a medical doctor, however, the nurse gave her Tylenol.

40.     Three hours later, Ms. Barlow-Austin's blood pressure was taken again. It was still high, measuring 157/96. Notwithstanding two straight days of successive high blood pressure

readings, LaSalle did not give her any blood pressure medication or place her on a blood pressure monitoring schedule. Nor did it arrange for her to be evaluated by a medical doctor.

41.    The next day, May 2, 2019, Ms. Barlow-Austin's husband went to visit her at the Annex. During the visit, he saw that she did not look well, and she complained of a bad headache and other medical issues. She also submitted a medical request form reporting numbness in her arms and legs, a painful knot on her throat, and a headache, and she requested pain medication.

42.    That same day, an outside mental health provider from Community Healthcore visited Ms. Barlow-Austin, who reported that she was very sick, that her right arm and leg were often numb, that she had high blood pressure, that she was dizzy, and that she had been passing out. After the visit, the provider spoke to the LaSalle Health Services Administrator (HSA), Michelle Arnold, a registered nurse and defendant in this case, who acknowledged that Ms. Barlow-Austin was hypertensive and had been fainting. Regarding the other very serious concerns, Defendant Arnold callously responded that Ms. Barlow-Austin "pretends to be weak" and "knows how to play the sickly role."

43.    At another point on May 2, 2019, Ms. Barlow-Austin was on her way to the nurse's station, when she became dizzy and lowered herself to the floor. Guards then assisted her into a wheelchair and transported her the rest of the way. At the nurse's station, a LaSalle nurse took her blood pressure. Once again, it was high, measuring 160/90. And once again, LaSalle ignored it. In addition, a urine sample revealed that Ms. Barlow-Austin was suffering from a urinary tract infection. Although LaSalle prescribed her medication for this, it was obvious that she needed a higher-level of medical care than she was getting at the jail.

44.     On May 3, 2019, jail guards were preparing Ms. Barlow-Austin to be transported to a court appearance when she fainted and hit her head, causing a hematoma on the left side of her face. Her blood pressure was checked, and it was again high—this time measuring 168/90. However, nothing was done to treat it.

45.     Later that day, Ms. Barlow-Austin saw a LaSalle family nurse practitioner, Steven Foltz, who is a defendant in this case. During the visit, she reported having a headache for two weeks, as well as nausea, vomiting, and blurred vision. Combined with her dangerously low CD4 count, the numbness in her arms and legs, her neck pain, her high blood pressure, her dizziness, and her fainting episodes (the most recent of which resulted in a head injury), Defendant Foltz should've arranged for her to be taken to the hospital. At a minimum, he should've ordered a comprehensive evaluation by a medical doctor. Instead, he provided her an over-the-counter anti-inflammatory and replaced her Fluconazole prescription with a *lower* dosage. Ms. Barlow-Austin was not evaluated by any level of medical provider for over two weeks following this May 3rd visit. Despite her extremely serious medical needs, not a single vital sign was taken during that two-week timeframe.

46.     On May 7, 2019, Ms. Barlow-Austin's husband visited his wife at the Annex facility. During the visit, she complained to him of a bad headache and several other medical problems.

47.     The following day, the outside provider from Community Healthcore visited Ms. Barlow-Austin again. During the visit, she stated: "I have been dizzy for about 3 weeks and have been fainting a lot." She also appeared unbalanced and reported fatigue. Shortly thereafter, LaSalle transferred her back to the Bi-State Jail where she would purportedly get better medical care.

48.     On May 13, 2019, LaSalle finally received the medical records from Ms. Barlow-Austin's outside treating provider, the Texas Care Clinic, which the intake nurse had requested five weeks earlier. The medical records indicated, among other things, that Ms. Barlow-Austin was "very immunocompromised." This was yet another indication that she needed a higher-level of medical care than she was getting at the jail.

49.     On May 15, 2019, Ms. Barlow-Austin's husband visited her at the Bi-State Jail. During the visit, she complained of a bad headache and pain in her legs. She told her husband that the LaSalle nursing staff was telling her that she was just stressed out and had a "tension headache." Her husband later reported concerns to the jail medical staff, but they refused to discuss the situation with him.

50.     On May 18, 2019, Ms. Barlow-Austin's husband again visited her. During the visit, she complained of a bad headache, pain in her legs, and fatigue. He also visited her the next day, and, again, she complained of the same problems. He also noticed her squinting as if she was having trouble seeing.

51.     In addition, on May 19, 2019, Ms. Barlow-Austin submitted a medical request form in which she reported dizziness, lack of appetite, an extreme headache, and an inability to stand. She was seen by a LaSalle nurse two days later, on May 21, 2019, and was placed on medical observation.

52.     The next day, May 22, 2019, Ms. Barlow-Austin submitted another medical request form in which she reported dizziness and a bad headache. That same day, her husband visited her. A LaSalle nurse had to assist her to the visit because she was unable to walk on her own. In addition, a female inmate beside her had to help her punch the code on the phone because she

couldn't see the numbers. During the visit, she told her husband that her headache was hurting badly and that all she wanted to do was sleep.

53.     On May 25, 2019, Ms. Barlow-Austin's husband visited her. Once again, a nurse had to assist her into the visiting room because she couldn't walk on her own. In addition, her head was still hurting; she was fatigued; and she was having trouble seeing.

54.     Between May 22 and May 28, 2029, Ms. Barlow-Austin's husband made several attempts to address the situation with LaSalle's nursing staff. He repeatedly expressed concerns about his wife's deteriorating condition. However, each time, the LaSalle nursing staff brushed aside his concerns and refused to discuss the situation.

55.     On May 29, 2019, Ms. Barlow-Austin submitted a medical request form reporting dizziness, a bad headache that was moving down into her neck, and nausea. In response to these serious and ongoing symptoms, she was seen by a LaSalle nurse, although it's not exactly clear when, and there's no indication that the nurse took any vitals.

56.     That same day, Ms. Barlow-Austin's husband visited her. This time, they brought her out in a wheelchair. His wife was clearly in pain—her head was hurting, and her legs were so weak that she couldn't stand on her own. Later that day, he spoke with Bowie County Sheriff James Prince. He reported specific and detailed concerns about his wife's deteriorating medical condition, and he told Sheriff Prince that LaSalle was not giving her adequate medical care. Sheriff Prince promised to resolve the situation; however, he never did.

57.     On May 31, 2019, Ms. Barlow-Austin was seen by LaSalle RN James McCann and LaSalle LPN Tiffany Hill, both of whom are defendants in this case. During the visit, these defendants noted that Ms. Barlow-Austin had been complaining of a headache "since she got to

16

the jail in April." Despite her previous high blood pressure readings, there is no indication that they took any vital signs. Moreover, in the notes for the visit, they wrote that she was suffering from a "tension headache," which is what the LaSalle nursing staff had been telling her all along.

58.     Given Ms. Barlow-Austin's myriad serious medical symptoms leading up to this point—her accelerated hypertension, blurred vision, nausea, vomiting, dizziness, headaches, neck pain and swelling, numbness in her limbs, difficulty standing and walking, fainting episodes (one of which resulted in a head injury), and a CD4 count of 87, which indicates a severely compromised immune system—it was long past the time for LaSalle to take her to the hospital. Even a fraction of those symptoms would warrant a trip to the local ER. Not taking her to the hospital put her at substantial risk of serious harm or death. Yet, LaSalle didn't take her. Not only that, but no LaSalle medical provider evaluated her during the following 10 days, and her vital signs were not taken during that timeframe.

59.     On June 1, 2019, Ms. Barlow-Austin's husband visited her. As before, LaSalle brought her to the visitation room in a wheelchair. By this point, her vision had deteriorated even further, and, because her head was hurting so badly, they had to cut the visit short so she could go back to her cell and lay down. In the days that followed, her serious medical condition continued to worsen—she became totally unable to walk or stand, and her vision deteriorated to the point where she went completely blind. The ongoing failure to take her to the hospital was cruel and inhumane.

60.     On June 5, 2019, Ms. Barlow-Austin's husband went to the Bi-State Jail to visit his wife. After waiting for about 30 minutes, a LaSalle guard told him that she was "refusing" to see him. Concerned, he called his mother-in-law and relayed what had happened. In response, she

went to the jail. However, she, too, was told by LaSalle that her daughter was "refusing" to see her. LaSalle did not inform Ms. Barlow-Austin's loved ones that she wasn't actually refusing to see them—she was too sick to do so. The next morning, a Community Healthcore provider went to the Bi-State Jail to visit Ms. Barlow-Austin. However, the visit didn't take place because Ms. Barlow-Austin supposedly "refused" to meet with her as well.

61.     On June 7, 2019, at 1:37 p.m., a LaSalle guard entered Ms. Barlow-Austin's medical observation cell and filmed a brief encounter with her using a handheld video camera. The footage shows her lying on her right side, holding her head with both hands. Her cell is filthy, littered with trash and debris. Her hair is matted, and her clothing appears soiled and stained. The LaSalle guard asks her if she wants to go see the "doctor," and she responds in a soft voice, saying either "I don't know" or "I don't, no." Regardless, the guard then states, "At this time, the offender has stated that she does not want to see the doctor." Ms. Barlow-Austin then twice says, "They don't never do nothing." The guard responds, "Okay," and the footage ends. The above-described video footage can be viewed here: Exhibit 1.

62.     Of course, there was no "doctor" at the facility, and Ms. Barlow-Austin knew full-well that her serious medical needs wouldn't be addressed by the jail nursing staff. By then, she had been begging for medical care for nearly two months. Her condition had deteriorated to the point where she could no longer walk, stand, or see. LaSalle LPN Tiffany Hill wrote in a progress note that Ms. Barlow-Austin had "refused to get up and come to medical." She also noted that, per FNP Foltz, Ms. Barlow-Austin was to remain in a medical observation cell where, notably, she wasn't being medically observed in any way, shape, or form.

63.     On June 8, 2019, Ms. Barlow-Austin's husband again went to the Bi-State Jail to visit her. Once again, he was told that his wife was "refusing" to visit him. LaSalle didn't tell him about her dire medical condition.

64.     On the same day, June 8, 2019, at 8:00 p.m., LaSalle LPN B. Cery, a defendant in this case, purportedly looked in Ms. Barlow-Austin's cell. She wrote in her progress notes that the inmate remained in "med obs," meaning a medical observation cell. Regarding Ms. Barlow-Austin's condition, she wrote: "0 needs voiced at this time" and "0 distress noted." This was a stunningly absurd observation—given that Ms. Barlow-Austin was in extreme pain and could not walk, stand, or see. In fact, LaSalle LPN Cery did not carefully look at her, if at all, and, instead, falsified the progress note.

65.     On the morning of June 9, 2019, at 8:28 a.m., jail video surveillance footage shows Ms. Barlow-Austin laying in the hallway on a mat. It then shows a LaSalle guard drag her on her mat into a medical observation cell. As she's being dragged into the cell, she's laying on her left side and holding her head with both hands. *See* Exhibit 2.

66.     For the next 48 hours, Ms. Barlow-Austin remained in this medical observation cell, which contains an in-house surveillance camera. The video footage is broken down into nearly two thousand video clips, most of which are between 30 seconds and two minutes long. In nearly all the clips, many examples of which are linked below, Ms. Barlow-Austin's serious medical needs are plainly evident.

67.     From the surveillance footage, it's readily apparent that Ms. Barlow-Austin is in near-constant pain—suffering from an unyielding headache. Although the footage has no sound, her relentless pain is clear from both her actions and her facial expressions. Beginning on her first

day in the cell, the footage shows her constantly holding her head with both hands, rubbing her forehead, wrapping/tying a scarf around her head, moaning, or grimacing in pain. *See, e.g.*, Exhibit 3, Exhibit 4, Exhibit 5, and Exhibit 6.[3]

68.     It's also plainly evident from the footage that Ms. Barlow-Austin has gone blind. At numerous points during her first day in the observation cell, the footage shows her crawling and blindly feeling her way around the cell. *See, e.g.*, Exhibit 7, Exhibit 8, and Exhibit 9. These same video clips (and many others) further show that she is physically disabled—unable to stand or walk and only able to crawl with tremendous difficulty and effort, often collapsing in exhaustion after doing so. She also appears weak, thin, and emaciated.

69.     On multiple occasions throughout her first day in the medical observation cell, Ms. Barlow-Austin tries to get someone's attention by yelling and/or banging on the door, wall, or observation window. *See, e.g.*, Exhibit 10, Exhibit 11, and Exhibit 12. No LaSalle nurses respond, and LaSalle corrections officers routinely walk by her cell without stopping or looking in. There are many other times where guards look in when she is yelling in discomfort or pain; but instead of doing anything in response, they ignore her and walk away. *See, e.g.*, Exhibit 13, Exhibit 14, and Exhibit 15.

70.     On that same day, there are instances in which Ms. Barlow-Austin appears to be pleading for water. At one point, for example, she catches the attention of a guard—as she's sitting near the observation window and knocking on it. In response, he opens the food tray slot in her cell door, and she begins blindly reaching in that direction—finding nothing. *See* Exhibit 16. An inmate tries to hand her a cup of water through the slot; however, seconds later, before she has a

---

[3]  These video clips (and many linked below) are merely illustrative; there are literally hundreds of other examples.

chance to get it, a guard shuts the slot, and it gets taken away. *See* Exhibit 17. She then bangs on the window and door again, but to no avail. *See id.* By this point, she'd been in this "medical observation" cell for almost nine hours with no food, no water, and no medical care, treatment, or evaluation.

71.    On June 9, 2019, at 6:00 p.m., a guard opens the food tray slot in Ms. Barlow-Austin's cell and sets a Styrofoam food carton and a cup of water in the slot. With great difficulty, she crawls to the door, reaches blindly, and yells; but she is unable to find the food and water that are sitting a mere foot or two in front of her face. *See* Exhibit 18 and Exhibit 19. At 6:01 p.m., the guard removes the food and water, closes the open slot, and walks away. *See id.* (Exhibit 19). At approximately 6:18 p.m., a guard drops a Styrofoam food carton on the floor of her cell; and at 6:31 p.m., the same guard cracks open the door and sets a cup of water on the floor. She has no clue that there's food and water on the floor of her cell. Shortly before 7:00 p.m., she sits up and accidentally kicks the water cup over with her foot. *See* Exhibit 20. She quickly grabs the cup, tries to take a drink from it, realizes it's empty, and lies down in a fetal position. *See id.*

72.    On the night of June 9, 2019, shortly before 8:00 p.m., a LaSalle nurse can be seen looking at Ms. Barlow-Austin through the food tray slot, which had just been opened by a guard. As the nurse is bent over looking at her, Ms. Barlow-Austin is clearly in distress—yelling, waiving her arms, and holding her head. *See* Exhibit 21. After looking at her for a few seconds, the nurse leaves. *See id.* Upon information and belief, the nurse who looked at her was LaSalle LPN B. Cery. As she did 24 hours earlier, this nurse wrote in her progress notes: "0 needs voiced" and "0 distress noted." As before, this ignores the reality that Ms. Barlow-Austin was plainly in distress and in grave need of assistance. Any basic evaluation of her would've quickly revealed that she was in

extreme pain and was unable to walk, stand, or see. In addition, this same LVN documented that she provided medication to Ms. Barlow-Austin at this time—when she clearly didn't do so.

73.     Shortly after 8:00 p.m., on the night of June 9, 2019, Ms. Barlow-Austin manages to open the food carton on the floor of her cell and takes two tiny bites of what appears to be a brownie. This is the only food she consumes that day. On the same night, at 8:28 p.m., a LaSalle guard enters her cell with a small paper cup of water and hands it to Ms. Barlow-Austin, who's laying on a mat. *See* Exhibit 22. The guard needs to guide the water into her hand (because she can't see), and she immediately starts drinking it. *See id.* This is the only water she's had during the 12 hours she's been in this medical observation cell.

74.     Throughout the night of June 9, 2019, Ms. Barlow-Austin's discomfort is evident. She continuously holds her head, rubs her head, wraps (and rewraps) a scarf around her head, moves uncomfortably, yells, moans, and/or grimaces in pain. At various points, she props herself up and crawls around her cell, blindly, before collapsing in exhaustion. Multiple LaSalle guards walk by her observation window without stopping or looking in her cell. Several of them falsely log state-mandated visual checks on their mobile devices. Occasionally, they stop and briefly look in, but they are clearly not carefully monitoring her for signs of medical distress. And the LaSalle nursing staff is missing in action. At no point during the night of June 9th does a single nurse enter Ms. Barlow-Austin's medical observation cell to check her vital signs, evaluate her, treat her, or provide her medication.

75.     On the morning of June 10, 2019, at 12:14 a.m., LaSalle Lieutenant Stuart Boozer comes to the door of Ms. Barlow-Austin's cell, opens the food tray slot, bends down, and begins talking to her through the open slot. He and a trustee inmate try to give her a paper cup of water

through the slot. In response, she props herself up and begins reaching, blindly, and trying to make her way toward the cell door—initially heading in the opposite direction. She eventually crawls toward the door, desperately trying to find the slot and the water but unable to do so. *See* Exhibit 23. Lt. Boozer then opens the door, *see id.*, and the inmate walks into the cell, carrying two small paper cups of water. *See* Exhibit 24. The inmate attempts to hand one of the cups to Ms. Barlow-Austin, who blindly struggles to find it, requiring him to guide it into her hand—as Lt. Boozer stands in the doorway, watching. *See id.* Once the cup is in her hand, she yells something in frustration and immediately begins drinking. *See id.* After handing her the cup of water, the inmate sets the second cup on the floor and backs out of the cell, covering his nose with his shirt to protect himself from the stench emanating from her cell. *See id.*

76.     The small cup of water that Ms. Barlow-Austin drank was only the second cup of water she'd had in the 16 hours that she'd been in the medical observation cell. In that same timeframe, she'd had only had a few tiny bites of food. She was dehydrated and malnourished. She was wearing the same filthy, soiled clothing that she'd been wearing since *at least* the 7th of June, and the odor in her cell was noxious.

77.     In the ensuing hours, Ms. Barlow-Austin's pain and discomfort is plainly evident. She continues to hold and rub her forehead; wrap, unwrap, and rewrap a scarf around her head; rock back and forth, move uncomfortably, and moan and wince in pain. At times, she attempts to crawl; but she's so unsteady that her body slams to the ground. *See, e.g.*, Exhibit 25.

78.     On June 10, 2019, at 3:29 a.m., Ms. Barlow-Austin unintentionally kicked over a full water cup that was sitting on the floor next to the observation window. This was the cup that an inmate had set down on the floor of her cell over three hours earlier, shortly after midnight. She

had no idea it was in her cell. This was the second time she'd kicked over a full water cup—not knowing it was there. At multiple points in the hours that followed, footage shows her picking up empty water cups and trying to drink from them, evidencing her unquenched thirst.

79.     On June 10, 2019, at 5:09 a.m., a guard opens the food tray slot in Ms. Barlow-Austin's cell, puts two cups of water in the slot, and reaches in and drops a second Styrofoam food carton on the floor. At 5:16 a.m., a guard removes one of the cups; and at 5:35 a.m., he removes the other. Ms. Barlow-Austin, who was clutching an empty water cup at the time, never knew the water was there. At this point, she had been in the cell for 21 hours and had only had two small cups of water and two tiny bites of food.

80.     By 6:00 a.m. on the morning of June 10, 2019, Ms. Barlow-Austin is so fatigued and weak that she can barely crawl; her movements are unsteady and uncoordinated; she appears to be disoriented and confused by her surroundings; and she looks even thinner than she did when she first entered the cell. *See, e.g.*, Exhibit 26, Exhibit 27, and Exhibit 28. At times, she can be seen laying down on the floor of her cell, moaning in apparent agony, while clutching an empty water cup. *See, e.g.*, Exhibit 29.

81.     The persistent pain from her headache prevents Ms. Barlow-Austin from getting any sleep. Between midnight and 8:00 a.m., she wraps, unwraps, and rewraps the scarf around her head more than 100 times. She also repeatedly holds and rubs her forehead, and her discomfort is evident from both her movements and facial expressions. During this eight-hour period, LaSalle guards frequently walk by her cell. Even though they don't look in, they continue to log their state-mandated visual checks. The few guards who look in do nothing in response to her dire condition. In the 24 hours that she's been in the cell, as of the morning of June 10, she still has only had two

small cups of water to drink. She continually clutches empty water cups—even when she's feebly crawling from one spot in her cell to another. She's obviously thirsty and dehydrated.

82.     On the morning of June 10, 2019, at 8:37 a.m., a LaSalle nurse comes to the door of the cell and knocks. At the time, Ms. Barlow-Austin is laying on her side—holding her head with one hand and clutching an empty water cup with the other. In response to the knock, she extends her hand with the empty water cup in the direction of the door. A guard opens the food tray slot, and words are exchanged between Ms. Barlow-Austin and the nurse; however, the guard never opens the door, and the nurse never enters the cell. And at 8:39 a.m., the food tray slot gets closed, and the nurse and guard walk away. This brief encounter is reflected in an 8:50 a.m. progress note written by LVN Markesha Jones, a defendant in this case, which states that Ms. Barlow-Austin was yelling, "water" and "give me some water." Yet, preposterously, LVN Jones also wrote that she "offered" water and medication and that Ms. Barlow-Austin "refuse[d]" to take either.

83.     It is also noteworthy that LVN Jones failed to take any vital signs or perform any sort of medical evaluation—when even a cursory exam would've shown that Ms. Barlow-Austin was in extreme pain, could not walk, could barely crawl, had lost all vision, and was dehydrated and visibly malnourished. Any lay person would've easily recognized that this poor woman needed emergency medical attention. Yet, LVN Jones consciously chose to disregard her dire medical needs.

84.     Throughout the remainder of the morning, Ms. Barlow-Austin continues to hold and rub her head in pain, move uncomfortably, moan, yell and scream, crawl feebly around the cell with great difficulty, reach and feel blindly, and clutch empty water cups—still wearing the

same filthy, soiled clothing that she'd been wearing for days. *See, e.g.*, Exhibit 30, Exhibit 31, Exhibit 32, and Exhibit 33. During that time, multiple guards walk by her cell, but few look in; and the LaSalle nursing staff continues to ignore her altogether.

85.     At 12:18 p.m., a LaSalle guard opens the door's food tray slot, and an inmate reaches in and drops a Styrofoam food carton inside. This is now the third food carton on the floor of her cell. No one has entered her cell to collect the old ones, which remain full of uneaten food and are, by now, unfit for human consumption. Because she can't see, Ms. Barlow-Austin has no idea which carton is the newest one. At 12:30 p.m., she blindly grabs one of the older food cartons, pulls it onto her mat, and opens it. In the ensuing minutes, she struggles to eat a small portion of the food inside. At several points, she attempts to eat with a plastic spoon; but because she can't see, she misses her mouth and spills food on her mat. This is the first time she's eaten anything in 16 hours. And in the 36 hours she's been in the cell, she's still only had two small cups of water. It's been 12 hours since her last drink.

86.     Throughout the early afternoon of June 10, 2019, Ms. Barlow-Austin continues to show signs and symptoms of medical distress. She appears to be even weaker, more lethargic, and less coordinated than before—as she blindly crawls around her cell. At one point, she struggles to lift and move one of the old Styrofoam cartons in her cell and ends up spilling food all over her mat. She then lays with her head on spilled food debris. *See* Exhibit 34. Thereafter, to avoid the filthy mat, she begins laying, awkwardly, with her head on the concrete floor. *See* Exhibit 35. LaSalle guards walk by, logging their state-mandated visual checks, either without stopping or without carefully looking in. *See, e.g.*, Exhibit 36.

26

87.     At 1:45 p.m., Ms. Barlow-Austin is laying on her back—with her head on the concrete floor, her knees bent, and her feet on the mat—when she pulls the mat under her lower body, pulls down her shorts, and urinates all over it. (A guard walks by without looking in as she's doing this.) She then scooches away and lays on her back, on the concrete floor, with her feet resting on the visibly urine-soaked mat. *See* Exhibit 37. In the minutes that follow, she remains on the floor, which, itself, is littered with trash and food debris, laying in various awkward positions in the corner of her cell—clutching an empty water cup the entire time. Multiple LaSalle Guards walk by either without looking in at all or looking in and disregarding her unsanitary and inhumane conditions of confinement.

88.     Shortly before 2:00 p.m., Ms. Barlow-Austin props herself up onto her knees and begins unsteadily crawling, blindly, away from the corner of the cell. *See* Exhibit 38. Her shorts are visibly drenched with urine. *See id.* She crawls a few feet and then lays down in a fetal position on her right side, with her head resting on the urine-soaked mat. *See* Exhibit 39. Then, at 2:30 p.m., she drags her soiled mat away from her cell's main living area, behind a concrete privacy wall, and outside the view of the cell's surveillance camera. It takes tremendous effort for her to do this.

89.     Ten minutes later, on June 10, 2019, at 2:40 p.m., while Ms. Barlow-Austin is outside the view of the surveillance camera, a LaSalle guard opens the door and sends two female inmates into the cell with cleaning supplies. After cleaning for several minutes, one of the inmates drags Ms. Barlow-Austin (who's laying on her soiled mat) back into the camera's view. The inmate then holds her hand and rubs her head, while Ms. Barlow-Austin appears to say, "Help me." *See* Exhibit 40. Regardless of the words she utters, she is plainly upset and in pain. *See id.* As the

inmate goes back to cleaning, Ms. Barlow-Austin slaps her mat and appears to again say, "Help me." *See id.* At least two LaSalle Guards are watching and listening as this is happening. *See id.*

90.     Thereafter, the inmates momentarily exit the cell, and Ms. Barlow-Austin begins reaching blindly and attempting to crawl—as one of the guards looks down at her. *See* Exhibit 41. The inmates return with a fresh mat and remove the old one, and Ms. Barlow-Austin continues struggling to crawl blindly around on the floor—as the guard continues to watch. *See* Exhibit 42. One of the inmates then assists Ms. Barlow-Austin onto the new mat to a position in which her urine-soiled shorts are visible to the onlooking guard. *See* Exhibit 43. After the inmates clean for another minute or two, the cell door is shut, and the guard and inmates walk away.

91.     Although Ms. Barlow-Austin's cell and mat were now clean, she was not taken to a shower. Her hair remained dirty and matted. She was not given any fresh clothing and was still wearing the same urine-soaked shorts and filthy shirt. She was not given a blanket or pillow. She was not given any food or water. The scarf she'd been using to ease the throbbing pain from her headaches was taken away. And her medical needs remained unaddressed. Indeed, seeing her condition—her physical pain, her crippling disability, and her complete blindness—should have triggered a 911 call. Any lay person would have recognized her need for immediate hospital transport. But no such call was made. And either the nursing staff was not notified, or they were notified but failed to respond.

92.     Left alone in her medical observation cell, without water, Ms. Barlow-Austin continued to show signs of pain and distress, and LaSalle guards and nurses continued to ignore her. At various points on the late afternoon of June 10, 2019, footage shows her holding her head in apparent anguish, slapping her mat, and yelling. *See, e.g.*, Exhibit 44.

93.     According to LaSalle records, Ms. Barlow-Austin had been "exhibiting abnormal behavior throughout the day." For example, she was heard yelling, "I'm trapped in here. Let me out." She was also heard yelling, "I need a fireman. I can't hear the fireman." Thus, in addition to everything else, she was now suffering from mental confusion and delirium. LaSalle LVN Jones notified LaSalle LPN Hill of Ms. Barlow-Austin's abnormal behavior. LPN Hill, in turn, notified LaSalle HSA Michelle Arnold about the situation. Once again, however, not one of these so-called healthcare providers did anything in response to her ongoing medical crisis.

94.     Ms. Barlow-Austin's serious medical needs remained on full display throughout the evening of June 10, 2019, and LaSalle personnel remained indifferent to them. For example, at one point, the footage shows her crawling, shakily and unsteadily, right in front of the medical observation window, when a guard stops to look in. She blindly reaches out toward the glass, as if asking for help, and he walks away. Shortly thereafter, several LaSalle guards walk by her observation cell window, without looking in, as she struggles to crawl. At another point, she's writhing uncomfortably on the floor, while several guards are standing right outside her cell's observation window—talking, laughing, and paying no attention to her. Guards continue to falsely log state-mandated visual checks.

95.     Shortly before 6:00 p.m., a LaSalle jail guard drops a Styrofoam food carton on the floor of Ms. Barlow-Austin's cell. However, she doesn't see it and likely doesn't know it's there. At this point, although she'd only eaten a few small bites of food that day, her need for water was greater. In the 34 hours that she'd been confined in the medical observation cell, Ms. Barlow-Austin had only had two small cups of water, and it had been nearly 18 hours since her last drink. Indeed, she was literally begging a nurse for water nine hours earlier.

96.     Likely suffering from severe dehydration, in addition to a virulent brain infection, her movements become slow, sluggish, uncoordinated, and clumsy. Yet, the jail guards entrusted with monitoring her medical needs continue to walk by her cell's observation window without carefully looking in—if at all. As the evening progresses, she makes multiple attempts to get someone's attention, but to no avail. At various points, footage shows her emphatically yelling and gesticulating towards the door. Although the footage is without sound, it's likely that she's pleading for water. But her pleas go unheeded.

97.     At 7:22 p.m., a guard opens the food tray slot and places two paper cups of water on it. At this point, it's been over 19 hours since Ms. Barlow-Austin has had anything to drink. However, she has no idea that there are two cups of water sitting in the food tray slot—just a few feet in front of her.

98.     Twenty-five minutes later, with the water cups still in the food tray slot, Ms. Barlow-Austin lifts one of the food tray cartons with her feet—bringing it towards her—and ends up spilling the entire contents on herself and the lower part of her mat. *See* Exhibit 45. She proceeds to frantically wipe the food off her legs—using her shirt and hands—and then begins trying to wipe off her shirt and mat. Frustrated, she moves her body off her now-soiled mat. *See* Exhibit 46. Later, after trying unsuccessfully to flip her mat over, she ends up laying down on it—with her face landing directly on the spilled food. *See* Exhibit 47.

99.     Thereafter, Ms. Barlow-Austin again tries, desperately, to turn her mat over, but she doesn't have the strength to do so and is only able to fold part of it over. She then again lays down on the soiled part of her mat. She calls for help, but no one comes to her aid. As she tries to flip over the mat yet again, she ends up spilling more food all over herself. In the ensuing 30

minutes, Ms. Barlow-Austin lays mostly on the concrete floor, in filth. Multiple guards walk by but do nothing to help her. She then expends great effort to sit up, move her mat out of the way, and blindly crawl up onto a concrete bench—where she remains, in various contorted positions, for the next 15 minutes. LaSalle guards continue to walk by, but no one stops to investigate.

100.   At 8:45 p.m., footage shows Ms. Barlow-Austin crawling feebly and unsteadily on the floor of the cell when one of her arms gives out, and her body collapses to the floor. *See* Exhibit 48. A LaSalle guard sees her laying with her head on the concrete floor, off her mat, in this filthy cell, but he does nothing. At all times over the ensuing hour, she is either lying, crawling, and/or sitting in ways that plainly show her grossly emaciated body, her physical disability, her lack of motor coordination, her extreme frailty, her lethargy, her mental confusion and disorientation, and/or her total blindness. *See, e.g.*, Exhibit 49, Exhibit 50, Exhibit 51, and Exhibit 52. Her medical distress is so obvious that the failure to summon help is inhumane and inexcusable.

101.   By 9:30 p.m. on the night of June 10, 2019, Ms. Barlow-Austin had been in this purported "medical observation" cell for more than 37 hours. It had been over 21 hours since her last drink. Unbeknownst to her, two cups of water had been in her cell door's food tray slot for the past two hours and ten minutes. At 9:32 p.m., she's sitting in the corner of the cell, with her back to the door—when she leans her head back and unintentionally knocks over one of the water cups, spilling the contents in the hallway outside her cell. *See* Exhibit 53. She's unaware this happened. An inmate can subsequently be seen mopping up the water in the hallway.

102.   Approximately 15 minutes later, at 9:46 p.m., Ms. Barlow-Austin is sitting in the corner of her cell with her back to the wall, when she begins blindly feeling the door and finds one of the two water cups—the empty one. *See* Exhibit 54. She quickly grabs it and brings it to her

mouth to take a drink. Realizing it's empty, she quickly begins blindly feeling the wall again and finds the other cup in the food tray slot. *See id.* & Exhibit 55. She immediately takes a drink and, while holding the two cups in one hand, reaches in the slot and feels for a third cup. *See id.* (Exhibit 55). After realizing there's no additional cup, she finishes the remaining water in the cup she's holding and begins yelling—presumably for more water. *See id.*

103.    At 9:50 p.m., a LaSalle guard comes to the door. He bends down, looks through the open food tray slot, and appears to say something to Ms. Barlow-Austin, who then holds up the empty cup and responds emphatically. She's likely pleading for water. The guard leaves and then returns to her cell five minutes later—not to bring water, however, but to close the food tray slot and walk away.

104.    As the night wears on, Ms. Barlow-Austin's dire condition worsens. It takes tremendous effort for her to scoot or crawl short distances; she travels, inch by inch, as if moving in slow motion; her loss of muscle coordination is obvious; she looks haggard and sickly. *See, e.g.*, Exhibit 56.

105.    On the night of June 10, 2019, at 10:22 p.m. LaSalle LVN A. Hughes, a defendant in this case, enters the cell and sees Ms. Barlow-Austin lying on the filthy floor. *See* Exhibit 57. It's the first time a nurse has entered in the 38 hours she's been in this purported medical observation cell. She proceeds to check Ms. Barlow-Austin's vitals for the first time in over two weeks. Her heartrate is abnormally high at 130 beats per minute, and her blood pressure is 177/123, which indicates a hypertensive crisis. In addition, it's obvious that she's physically disabled, uncoordinated, disoriented, malnourished, and blind. Coupled with these additional signs and symptoms, her high blood pressure reading constitutes a hypertensive emergency. It should trigger

an immediate 911 call. But it doesn't. After checking her vitals, Defendant Hughes exits the cell, leaving Ms. Barlow-Austin alone inside. Not only that, but there's nothing in the records to indicate that she reported her alarming findings to a higher-level medical provider.

106.    Following the nurse's visit, no one brings Ms. Barlow-Austin any food or water. She remains in the same squalid jail cell, with no blanket or pillow—barely able to crawl, blind, weak, lethargic, uncoordinated, unbalanced, disoriented, gaunt, shrunken. *See, e.g.*, Exhibit 58, Exhibit 59, Exhibit 60, Exhibit 61, Exhibit 62**,** and Exhibit 63. Her anorexic appearance resembles a starving prisoner of war. Multiple LaSalle guards walk by her cell without looking in, falsifying state-mandated visual checks. And those who look in do nothing in response to her sickly state.

107.    On the morning of June 11, 2019, approximately 5:45 a.m., a guard enters Ms. Barlow-Austin's cell, along with LaSalle Assistant Warden Robert Page. By then, she's no longer moving and is clinging to life. While Assistant Warden Page is in the cell, looking at Ms. Barlow-Austin, the guard explains to him that she'd lost her vision and is totally blind. Although this should trigger immediate hospital transport, it doesn't. And another two hours passes.

108.    Shortly before 8:00 a.m., a LaSalle guard and nurse enter Ms. Barlow-Austin's cell with a wheelchair. *See* Exhibit 64. She's blind, emaciated, and barely able to move. It takes the efforts of both the guard and the nurse to pick her up and put her in the wheelchair, *see id.*, for the purpose of bringing her to the medical office for a lab draw. They then wheel her out of the medical observation cell. *See* Exhibit 65.

109.    Upon her arrival in the medical office, Ms. Barlow-Austin is "confused and unoriented," asking, "Where am I? Why am I here?" She's begging for water but physically unable to hold a cup when one is handed to her. She's hypertensive and tachycardic—with a heartrate of

148 beats per minute. Her respiratory rate is abnormally low. The nursing staff is unable to draw blood because she has no "visible veins," indicating severe dehydration. She's visibly malnourished. Her pupils are not reactive to light. The medical staff finally decides that it's time to call 911, and, shortly thereafter, responding medics transport her to the local emergency room via ambulance. By this time, she's beyond saving.

110.     Ms. Barlow-Austin didn't suddenly take a turn for the worse on the morning of June 11, 2019. Her medical condition warranted hospitalization *long* before then. By the time LaSalle finally arranged for her to be transported to the hospital, she'd been complaining about increasingly severe symptoms for nearly two months. This included extreme headaches, nausea, vomiting, blurry vision, dizziness, fainting episodes (one of which led to a head injury), hypertension, severe neck pain, a large knot on her neck, and numbness in her legs. Over time, her blurry vision slowly transitioned to complete blindness, and the numbness in her legs slowly evolved from difficulty standing and walking to an inability to stand or walk. Weeks earlier, she presented with the hallmark symptoms of life-threatening meningitis, which was a known risk for her. Despite her alarming and progressively worsening symptoms, LaSalle never arranged to have her evaluated by a medical doctor.

111.     During her last two days in the Bi-State Jail, she was constantly holding and rubbing her head, moaning in pain. She was sleep deprived, dehydrated, and half-starved. She had only three small cups of water and a few small bites of food. By the morning of June 11, 2019, she was so thin and emaciated that her bones were jutting out. Her last 48 hours were tantamount to torture. The callousness with which she was treated amounted to abject cruelty that shocks the conscience.

112.    In addition to her wholly inadequate medical care, Ms. Barlow-Austin was housed in inhumane conditions of confinement. Her cell was often squalid—literally littered with spilled food, uncollected meal cartons, and trash. She had no shower for days on end. Her hair was matted. Her clothes and her mat were soiled with old food debris and urine. Her jail cell smelled so bad that it caused another inmate (who briefly entered her cell) to cover his nose with his shirt—to protect himself from the stench. She never had a pillow. And for the last 17 hours, she had no blanket. She spent much of her last night laying on the concrete floor, using her filthy mat as a blanket or pulling her dirty t-shirt over her knees for warmth.

113.    Throughout much of her confinement, not just the last two days, Ms. Barlow-Austin was held in a so-called medical observation cell. And, yet, in character for LaSalle, there was no medical observation. At a minimum, LaSalle nurses were obligated to regularly check on their patient. They did not do so.

114.    During the final 48 hours of her confinement, only one nurse entered her cell to check her vitals. This occurred on the night of June 10, 2019. At that time, she was tachycardic and suffering from a hypertensive emergency. She was blind, mentally confused, disoriented, shaky, unsteady, and so physically incapacitated that she could barely crawl. Even then, she was not taken to the hospital for another ten hours. By the time LaSalle finally called 911, it was too late to save her life.

115.    It wasn't just the LaSalle nurses who ignored her dire medical needs. Throughout her last 48 hours of confinement, LaSalle guards routinely walked by her medical observation cell window—either without looking in at all, or looking in and ignoring her filthy conditions, obvious pain, physical disability, and blindness. Few guards made any effort to speak to her, get her

attention, or ask her how she was doing. Multiple guards violated their state-mandated obligation to conduct face-to-face checks every 30 minutes; they routinely documented such checks, when they clearly didn't do them.

116.    Upon her belated arrival at the emergency room, Ms. Barlow-Austin's pupils were fixed and dilated. She was blind. She was not oriented to time, place, or person. Her neck was stiff. She was in great pain, rendering it impossible for the hospital to do an MRI. Hospital admission records describe her as being "very hypertensive." She was tachycardic, with a heartrate of 148 beats per minute. Her potassium levels were dangerously low at 2.3, which indicates dehydration and malnourishment. She was immediately given IV fluids and a feeding tube.

117.    Deplorably, no one from LaSalle informed Ms. Barlow-Austin's family that she had been hospitalized—not her husband, who frequently visited her in jail, and not her parents. Between June 11 and June 14, 2019, her family had no idea that she was in the local hospital, in critical condition, barely clinging to life.

118.    On June 15, 2019, Ms. Barlow-Austin's husband went to visit her at the Bi-State Jail, assuming she was still confined there and having no reason to think otherwise. When he arrived, LaSalle guards told him that his wife was no longer in the unit. When he asked why, LaSalle wouldn't tell him. He then called Bowie County Sheriff James Prince, who told him that his wife was in the hospital—gravely ill. When the family arrived at the hospital, the LaSalle guard wouldn't let them visit her. It took another phone call to Sheriff Prince—and a personal trip to the hospital by him—for LaSalle to allow Ms. Barlow-Austin's family to see their dying loved one.

119.    Two days later, on June 17, 2020, Ms. Barlow-Austin was dead. The hospital listed her cause of death as fungemia/sepsis due to fungus, cryptococcal meningitis, HIV/AIDS, and

accelerated hypertension. Her death was caused by LaSalle agents and employees who failed to provide her prescription medication, failed to manage her chronic medical condition, failed to monitor her medical needs, failed to conduct face-to-face checks on her, failed to address her high blood pressure, failed to have her evaluated by a medical doctor, failed to take her to the hospital in a timely fashion, and otherwise failed to house her in humane conditions of confinement.

120.    Throughout the bulk of her confinement, Ms. Barlow-Austin was suffering from objectively serious medical needs. Yet, multiple LaSalle agents and employees acted with deliberate indifference to those needs. These corporate agents and employees had a constitutional duty to act when they became subjectively aware that she was suffering from objectively serious medical needs. Their failure to do so put her at substantial risk of serious harm and caused or contributed to her unnecessary pain and suffering and her death. And the acts and omissions of these individuals were committed with intent, malice, and/or with reckless disregard for her federally protected constitutional rights.

121.    The deliberate indifference to Ms. Barlow-Austin's serious medical needs came from both jail guards and medical providers. Every guard, for example, who walked by her medical observation cell without looking in—when they were entrusted with monitoring her—was deliberately indifferent to her serious medical needs. Numerous LaSalle corrections fall into this category, particularly those who falsified their observation logs in flagrant violation of their state-mandated duty to conduct regular visual checks on her wellbeing.

122.    Every guard who actually looked in and saw Ms. Barlow-Austin laying on the concrete floor, barely able to crawl, completely blind, holding her head in pain, moaning, yelling,

and/or calling for help, and responded by doing nothing, was deliberately indifferent to her serious medical needs. Multiple guards fit this description.

123.    Any guards who entered Ms. Barlow-Austin's cell, saw her, and failed to report her dire condition to the medical staff were deliberately indifferent to her medical needs. This includes Lt. Stuart Boozer and a handful of other currently unidentified corrections officers. Assistant Warden Bob Page likewise acted with deliberate indifference when he entered her cell on the morning of June 11th and failed to arrange for immediate hospital transport.

124.    Finally, each and every guard who failed to address the filthy and unsanitary conditions in her cell and/or failed to ensure that she received an adequate supply of drinking water and food violated her basic constitutional right to be housed in humane conditions of confinement. Many guards are responsible for these deprivations.

125.    LaSalle medical providers also acted with deliberate indifference to Ms. Barlow-Austin's serious medical needs. The named defendants and other unnamed members of the jail medical staff all knew of her HIV-positive status and her susceptibility to deadly infections, including fungal meningitis. They knew about her dangerously low CD4 count in mid-April. And they knew that by the end of that month, she was suffering from persistent head and neck pain (which she rated 10/10 on the pain scale), dizziness, high blood pressure, and numbness in her legs. By the 3rd of May, she was also suffering from nausea, vomiting, blurred vision, and accelerated hypertension, and her ongoing dizziness had caused several fainting episodes—one of which resulted in a head injury. By then, it was obvious that she needed a higher level of care than she was getting. Not taking her to the hospital put her at substantial risk of serious harm. And from there, her symptoms continued to worsen. By May 22nd, she could no longer walk or stand, and

her vision was badly impaired. All the named medical providers (and other unnamed individuals) were personally aware of these serious symptoms and had a constitutional obligation to arrange for hospital transport.[4]

126.    Defendants Steven Foltz and James McCann were advanced registered nurse practitioners, and Defendant Michelle Arnold was the HSA and a registered nurse. These on-site medical providers were directly involved in Holly Barlow-Austin's care. They supervised the lower-level nurses—the LVNs and LPNs. They each had first-hand knowledge of Ms. Barlow-Austin's extremely serious medical needs. They personally participated in the failure to secure adequate medical care for her. They were gatekeepers at the jail—entrusted to ensure a higher level of care for patients who needed it. Each of them engaged in conduct that knowingly put Ms. Barlow-Austin at substantial risk of serious harm and which caused or contributed to her unnecessary suffering and death. They are responsible for their own constitutional violations and for the constitutional violations of their subordinates.

127.    By early June, Ms. Barlow-Austin was physically disabled, unable to walk, and blind. The lower-level nurses named herein—Defendants Hill, Jones, Hughes, and Cery—were personally aware of her alarmingly serious medical needs. Yet, these LVN/LPNs (and others) failed to conduct their required visual checks, failed to follow healthcare protocols, failed to document their patient's highly abnormal medical signs and symptoms, failed to keep honest and accurate medical records, failed to administer essential doses of medication, failed to communicate

---

[4]  Defendant Timothy Reynolds, M.D., was LaSalle's off-site medical director. Presumably, he was being regularly updated by on-site medical staff about Ms. Barlow-Austin's condition throughout her confinement. If indeed he was aware of the above-described symptoms, he had a constitutional obligation to order hospital transport. Not doing so constituted deliberate indifference. Alternatively, if he was not aware of her alarming symptoms, the on-site medical providers who failed to inform him were deliberately indifferent.

among one another about their patient, failed to report her severe medical needs to higher-level providers—in dereliction of their gatekeeping duty—and failed to call 911 or otherwise secure timely hospital transport. Each of them engaged in conduct that knowingly put Ms. Barlow-Austin at substantial risk of serious harm and which caused or contributed to her unnecessary suffering and death.

128.    The conduct of the above-named LPN/LVNs was particularly abhorrent in the last 48 hours of Ms. Barlow-Austin's confinement. By then, she was not only gravely ill, but she was also severely dehydrated and grossly malnourished. She was so visibly emaciated that her bones were jutting out. She had no business being locked up in a jail cell in her condition, and each of them knew that keeping her there was putting her life in grave danger. They had a constitutional and moral duty get her to a hospital.

129.    The conduct of the individual defendants alleged herein (and the conduct of other unnamed individuals) was committed with intent, malice, deliberate indifference, and reckless disregard for Ms. Barlow-Austin's federal constitutional rights and caused the damages described in this complaint.

**B.      Additional Facts Applicable to the Corporate Defendants**

130.    The unconstitutional acts and omissions alleged herein—as well as the inhumane conditions of confinement—were carried out in accordance with the official policies, procedures, practices, and customs of the Corporate Defendants (LaSalle and LaSalle Management). These corporate policies, procedures, practices, and customs, which are described in more detail below, were the moving force behind the unconstitutional actions that led to Ms. Barlow-Austin's pre-death pain and suffering and her death.

131.    In the years leading up to 2019, the Corporate Defendants engaged in a pattern, practice, and custom of unconstitutional conduct toward inmates with serious medical needs, including denying prescription medication, disregarding healthcare protocols that were designed to protect inmates from harm, failing to conduct state-mandated face-to-face checks on inmates, falsifying observation logs, fabricating medical records, failing to monitor inmates in medical observation cells, mismanaging patient medical charts, withholding important information from qualified medical providers, maintaining a deficient medical record-keeping system, ignoring abnormal vital signs, allowing low-level nurses (LVN and LPNs) to practice outside the scope of their medical licenses, failing to conduct essential medical tests and checks, neglecting inmates with chronic medical conditions, downplaying life-threatening symptoms, failing to transport inmates with emergency medical needs to the hospital, and otherwise depriving them of needed medical treatment.

132.    As of the time of Ms. Barlow-Austin's confinement, there had been multiple instances in the Bi-State Jail (and in other correctional facilities run by the Corporate Defendants) of inmates being systemically denied constitutionally adequate medical care by LaSalle and its agents or employees. Several of these instances involved high-profile lawsuits about which the Corporate Defendants were acutely aware, including those that were covered by local and national media outlets, putting company policymakers on notice that the Bi-State Jail and other LaSalle-run facilities were engaging in practices that endangered the lives of inmates.

133.    For example, in July 2015, 35-year old Michael Sabbie died in the Bi-State Jail because LaSalle ignored his serious medical needs and failed to take him to the hospital—despite his life-threatening medical symptoms. LaSalle staff knew that he suffered from multiple chronic

medical conditions, including hypertension, asthma, diabetes, and heart disease. Nevertheless, they failed to give him medication, failed to check his blood pressure and blood sugar, failed to medically monitor him (even after assigning him to a medical observation cell), failed to conduct state-mandated face-to-face checks, failed to communicate his medical needs to qualified medical providers, and failed to summon or secure emergency medical care for him.

134.    In the leadup to Michael Sabbie's death, LaSalle nurses disregarded healthcare protocols, falsified records, and practiced medicine outside the scope of their licenses. Despite his objectively serious medical signs and symptoms, nurses accused him of faking his medical condition. In addition, LaSalle guards fabricated observation logs—suggesting that they were checking on him when, in fact, they were not doing so—and failed to summon emergency medical care, even when he was plainly dying in front of them. Poor training and inadequate staffing caused or contributed to his death. In a lengthy, 169-page report and recommendation to deny LaSalle's motion for summary judgement, United States Magistrate Judge Caroline M. Craven documented overwhelming evidence of systemic constitutional deficiencies at the Bi-State Jail. *See Sabbie v. Southwestern Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463 (E.D. Tex., Mar. 6, 2019).

135.    Even after Mr. Sabbie's death and the well-documented evidence of the systemic constitutional deficiencies that caused it, LaSalle did nothing to fix the problems. The company took no steps to correct the nursing staff's failure to follow healthcare protocols and its failure to meet basic standards of care. Nor did it implement any policy changes to ensure better care for inmates with chronic medical conditions. Incredibly, LaSalle conducted no internal review into

the death of Mr. Sabbie. Nothing changed and, predictably, LaSalle's pattern of unconstitutional misconduct persisted.

136.    In July 2016, approximately one year after Michael Sabbie's death, a young woman named Morgan Angerbauer died in the Bi-State Jail because LaSalle personnel again failed to follow healthcare protocols, failed to conduct vital medical tests, failed to conduct state-mandated visual checks, failed to monitor her serious medical condition (despite assigning her to a medical observation cell), failed to give her medication for her chronic medical condition, and failed to take her to the hospital despite her plainly life-threatening medical needs. *See Leigh v. Southwest Correctional, LLC.*, No. 5:17cv129. Despite her objectively serious medical condition, LaSalle nurses accused her of faking it. Once again, poor training, inadequate staffing, and other systemic constitutional deficiencies caused or contributed to this inmate's death. As was the case with Michael Sabbie, LaSalle personnel again falsified records to suggest they were conducting state-mandated visual checks. Following Morgan Angerbauer's death, LaSalle's unconstitutional acts and practices continued.

137.    The following year, in November 2017, an inmate named Juan Jose Cordova-Sanchez died in the Bi-State Jail. While being restrained by LaSalle guards on the ground in a prone position, the inmate became unresponsive. Despite this man's obvious and immediate need for emergency medical care, life-saving measures were not undertaken until it was too late to save his life.

138.    In April 2018, a detainee in the Bi-State Jail suffered a stroke. Despite repeated pleas for help by other inmates, trustees, and family members of the stroke victim, LaSalle personnel, including on-duty nurses, disregarded healthcare protocols and failed to provide any

43

treatment or call an ambulance for approximately 24 hours. Still, LaSalle did nothing to correct the systemic constitutional deficiencies, and the company continued to maintain unconstitutional practices that put inmates at substantial risk of serious harm.

139.    Three months later, in July 2018, a Bi-State Jail inmate named William Jones was severely beaten and injured during his confinement. *See Jones v. Southwest Correctional, LLC*, No. 5:19-cv-00104. Despite his life-threatening medical needs, LaSalle staff deprived him of medication, failed to follow healthcare protocols, failed to monitor his serious medical needs, failed to conduct face-to-face checks (while documenting otherwise), and failed to arrange for hospital transport in a timely fashion.

140.    Although Mr. Jones was put in a medical observation cell, LaSalle staff conducted virtually no medical monitoring of him. In addition, despite knowing that he suffered from hypertension, LaSalle medical providers took no vital signs—even after he was gravely injured. Nor did they make any effort to provide him with food or water, causing him to suffer from severe dehydration. Instead of arranging for Mr. Jones to be taken to the hospital, LaSalle "released" him to his sister, who had had him transported to the hospital by ambulance. By that time, he was near death's door. He was placed on a ventilator and remained hospitalized for nearly a month. Yet, rather than addressing the constitutional deficiencies that allowed this to happen, LaSalle sought to cover it up by destroying surveillance footage and other relevant information.

141.    In March 2019, an inmate named Franklin Greathouse died while in LaSalle's custody at the Bi-State Jail. Although Mr. Greathouse reported having a seizure, he was not seen by a medical doctor or taken to the hospital. LaSalle medical providers accused him of faking it. He died later that same day from a seizure. Once again, state investigators found LaSalle to be out

of compliance with jail standards. After his death, an investigation by the Texas Commission on Jail Standards determined that LaSalle guards failed to conduct the requisite face-to-face checks on Mr. Greathouse—while falsely documenting them in their observation logs.

142.    The above-described incidents that lead up to the death of Holly Barlow-Austin all took place at the Bi-State Jail—where she was held during most of her confinement. In each of these instances, LaSalle staff disregarded basic healthcare protocols, deprived inmates of needed medical care, failed to monitor their medical needs, violated state-mandated visual check requirements, and delayed or denied emergency care or hospital transport even when the inmates were obviously suffering from life-threatening medical complications. Despite each of these tragic outcomes, most of which resulted in death, LaSalle failed to correct the unconstitutional policies, practices, and customs that caused them to happen. And, as expected, the systemic constitutional deficiencies continued.

143.    The unconstitutional policies, practices, and customs described above have not been limited to the Bi-State Jail and have caused unnecessary suffering and deaths in multiple other LaSalle-run Texas facilities. For example, in September 2013, an inmate named Greg McElvy died in the Johnson County Jail, which is operated by LaSalle. Over the course of three days, this inmate exhibited alarming symptoms—he was not eating or drinking; he was vomiting; he lost control of his bodily functions; he was urinating and defecating on himself; and he was suffering from severe respiratory distress. He also had abnormal blood pressure. He repeatedly told jail staff that he was dying and begged for medical attention. Multiple inmates, and one guard, tried to get the LaSalle medical staff to help. However, despite his life-threatening medical needs, he was neither taken to the hospital nor seen by a medical doctor. LaSalle nurses disregarded basic

healthcare protocols. By the end of those three days, he was found unresponsive, in a pool of vomit. He died of untreated acute bronchopneumonia and asthmatic complications.

144.    In May 2015, another inmate, Ronald Beesley, died in LaSalle's Johnson County Jail—after complaining of chest pain and experiencing swelling in his limbs. His wife visited him the day before his death. After observing that he could barely walk and was struggling to talk, she and another family member contacted a LaSalle jail official and expressed concern that he would die without immediate medical intervention. However, LaSalle staff did not take him to the hospital or even have him evaluated by a medical doctor. Consequently, Mr. Beesley ended up dying in jail the following night from an infection in his chest that could have been treated with simple antibiotics. Disregarding healthcare protocols, failing to monitor his medical needs, ignoring his life-threatening medical condition, and refusing to take him to the hospital led directly to Mr. Beesley's unnecessary death.

145.    In November 2015, an inmate named Michael Martinez was found hanging from the ceiling of his cell at the LaSalle-run Jack Harwell Detention Center in Waco, Texas. An investigation revealed that no one had checked on Mr. Martinez in the three hours leading up to when his body was discovered—in violation of state correctional standards. Another inmate, Kristian Culver, died in the same facility seven months later, in May 2016, under similar circumstances. Once again, an investigation revealed that LaSalle guards were not conducting their state-mandated face-to-face checks. Poor training and inadequate staffing also caused or contributed to these deaths.

146.    In 2015-2016, two detainees died in a LaSalle-run jail in McLennan County, Texas. In each instance, LaSalle guards failed to conduct the state-mandated checks and falsified records

to suggest their checks had been done. At least one guard admitted that the company had instructed jail staff to falsify inmate observation logs. Similar testimony was elicited in the Michael Sabbie litigation. Poor training and inadequate staffing also caused or contributed to these deaths.

147.    In November 2017, an inmate named Denay Lauren Birnie died in LaSalle's Parker County Jail of a drug-related overdose. Despite her serious medical needs, she was not seen by a medical doctor or taken to the hospital. As with so many others, LaSalle staff failed to monitor her medical condition. An investigation by the Texas Rangers concluded that falsified checks played a role in her death. In December of the following year, an inmate named Andrew DeBusk died in the same facility after being restrained by LaSalle guards. Even when he was nonresponsive and his face had turned purple and gray, LaSalle guards and a LaSalle nurse ignored his emergency medical needs until it was too late to save his life.

148.    In the years leading up to the death of Holly Barlow-Austin, LaSalle-run facilities in Texas routinely failed inspections. According to Brandon Wood, the Executive Director of the Texas Commission on Jail Standards, LaSalle has had "continual noncompliance issues" in Texas, more than other jail operators in the state. In fact, LaSalle-run jails in Texas have been on the state's noncompliance list every year between 2015 and 2019.

149.    LaSalle facilities have also come under scrutiny by state lawmakers for hiring a disproportionate number of "temporarily licensed" corrections officers—taking advantage of a loophole that allowed correctional facilities to hire and staff their jails for up to one year with guards who hadn't gone through the basic correctional training academy. LaSalle did this purely for monetary reasons and without regard for inmate health and welfare. Hiring these untrained guards was cheaper than hiring experienced guards or paying to send them to the corrections

academy for their basic training. The Bi-State Jail actively participated in this reckless, profit-driven scheme.

150.    Not only did LaSalle hire a disproportionate number of these temporarily licensed jailers, but it failed to give them state-mandated on-the-job training. Between 2015 and 2019, LaSalle guards engaged in a persistent pattern of falsifying training records. This occurred in multiple LaSalle-run facilities, including the Bi-State Jail. In the Michael Sabbie case, for example, guards testified that LaSalle literally instructed corrections officers to fill out training records indicating that their on-the-job training had been completed, when it had not even begun. Similarly, the Texas Commission on Law Enforcement Standards secured more than a dozen sworn statements from guards at LaSalle's Parker County Jail confirming that they did not receive training that the company reported to the commission. Guards from other LaSalle-run jails have given similar accounts to investigative journalists.

151.    In the years leading up to the death of Holly Barlow-Austin, LaSalle had a well-documented practice of failing to adequately train their security personnel on recognizing and responding to the serious medical needs of inmates and detainees. The need for this training was obvious because LaSalle often hired detention staff with little or no corrections experience, and it was foreseeable that the lack of such training would cause harm to inmates and detainees. In fact, the inadequate training of LaSalle jail guards caused or contributed to multiple bad outcomes in the Bi-State Jail prior to Ms. Barlow-Austin's death. In litigation involving both the death of Michael Sabbie and the death of Morgan Angerbauer, for example, multiple corrections officers testified that LaSalle did not even train them that they had a constitutional duty to summon medical

care for inmates with serious medical needs. These same training deficiencies played a substantial role in Ms. Barlow-Austin's unnecessary suffering and death.

152.    The inadequate training was not limited to jail guards. LaSalle also failed to train its jail nursing staff on how to recognize and respond to the serious medical needs of inmates, follow healthcare protocols, monitor inmates in medical observation cells, conduct medical examinations in accordance with basic standards of care, notify qualified providers of abnormal findings, consult with and involve medical doctors in patient care, correctly maintain and review medical charts, and contact emergency services in a timely fashion. The need for this training was obvious, particularly in the Bi-State Jail, because there is no doctor on site and because the jail utilizes lower-level nurses (LVNs and LPNs) in inmate-patient care. Indeed, despite their limited scope of license, these LVN/LPNs are often the only ones providing healthcare at the Bi-State Jail.

153.    It was foreseeable that the training deficiencies outlined above would cause harm to inmates and detainees, such as Ms. Barlow-Austin. In fact, just as the inadequate training of jail guards caused or contributed to multiple bad outcomes in the Bi-State Jail prior to Ms. Barlow-Austin's death, so, too, did the inadequate training of LaSalle LPN/LVNs. In litigation involving both the death of Michael Sabbie and the death of Morgan Angerbauer, for instance, several LaSalle LVN/LPNs testified that they received little to no training and were not even aware of the corporation's healthcare protocols. These same training deficiencies played a substantial role in Ms. Barlow-Austin's unnecessary suffering and death.

154.    In addition to its inadequate training, the practice of insufficient staffing has been a well-documented and persistent problem at LaSalle-run Texas jails. In fact, staffing shortages led to several of the constitutionally deficient practices outlined above. For example, one of the

reasons why LaSalle guards routinely fail to monitor detainees and conduct their state-mandated checks is because there are not enough of them to do the job. Likewise, staffing shortages play a role in nurses failing to check vital signs and disregarding time-consuming medical protocols. It is also one of the reasons why LaSalle fails to take inmates to the hospital, even when they are suffering from life-threatening medical needs. When an inmate is taken to the hospital, it requires a guard to be posted by the inmate's room. If the jail has staffing shortages, it cannot afford to lose the manpower it would lose if an inmate is hospitalized. Insufficient staffing practices at the Bi-State Jail and other LaSalle-run facilities caused harm to multiple inmates in the years leading up to Ms. Barlow-Austin's confinement, and such practices played a substantial role in her suffering and death.

155.    One of the most glaring systemic deficiencies is LaSalle's medical observation policy, which is plainly unconstitutional as implemented. When LaSalle identifies an inmate with serious medical needs, the corporate policy is to place the inmate in a medical observation cell. In theory, this is appropriate. However, when LaSalle places an inmate on medical observation, zero medical monitoring takes place. Instead, corrections officers with no medical training or experience are put in charge of monitoring them. And their so-called medical monitoring consists of guards quickly peeking in the cells—often while walking by without stopping. They are not trained to look for abnormal signs or symptoms, ask questions of the inmates, carefully examine them, or document any observations. Instead, they are told not to summon care so long as the inmates were alive and breathing. And because of LaSalle's persistent understaffing problems, guards routinely fail to conduct even these perfunctory checks. LaSalle's "medical observation" policy led to disastrous results in the case of Michael Sabbie, Morgan Angerbauer, William Jones,

and others. Despite these negative outcomes, the company made no effort to correct this plainly unconstitutional policy, and, predictably, Holly Barlow-Austin became its latest victim. The failure to carefully monitor her while she was housed in a medical observation cell resulted in her life-threatening medical needs being ignored and caused or contributed to her suffering and death.

156.    LaSalle also has a longstanding practice of denying medication and medical care to sick or injured inmates based on their alleged "refusal" to receive the medicine or care. Yet, in many instances, the inmates are too hurt or ill to physically get up to receive the medication or medical care. Moreover, LaSalle has a longstanding practice and corporate culture of treating inmates as "fakers," accusing them of feigning illness or distress when they report medical problems, and assuming all inmates fit into this description—even when they are displaying objectively abnormal vital signs and symptoms. Each of these longstanding practices predictably caused harm to inmates in the years leading up to Holly Barlow-Austin's confinement, and each of them played a substantial role in her suffering and death.

157.    Additionally, LaSalle-run facilities have a longstanding practice of poor medical record-keeping and miscommunication among jail medical providers. This has been a major problem at the Bi-State Jail—where medical records are routinely lost, and communication breakdowns are commonplace. Lower-level nurses often fail to convey important information about patient-inmate care needs to one another and to higher-level providers. These practices predictably put inmates at substantial risk of serious harm. They, in fact, contributed to negative outcomes for multiple inmates, including Michael Sabbie, Morgan Angerbauer, and William Jones, and they played a substantial role in Ms. Barlow-Austin's constitutionally deficient care.

158.    As was the case with other inmates who died in LaSalle-run facilities, the failure to secure needed medical care for Ms. Barlow-Austin was motivated, in part, by constitutionally impermissible profit-driven reasons. The Corporate Defendants had a practice of submitting unrealistically low bids to get jail contracts. After securing the contracts, they would then cut costs, or keep their budgets unrealistically low, to make money. This included hiring inexperienced jail guards and lower-level nurses and failing to invest in adequate training. It also included spending inadequate amounts on correctional medical care and habitually understaffing its facilities. It was foreseeable that LaSalle's inadequate training, insufficient medical spending, and understaffing would cause harm to inmates and detainees in need of medical care. In fact, these reckless profit-driven practices resulted in substantial harm to multiple inmates in the years leading up to Ms. Barlow-Austin's confinement. And these same unconstitutional practices caused her unnecessary suffering and death.

159.    The Corporate Defendants had a duty to treat Ms. Barlow-Austin in accordance with the applicable constitutional standards of medical and correctional care. The Corporate Defendants breached those duties, and Ms. Barlow-Austin's damages, including her pain and suffering and her death, were the direct and foreseeable result of the unconstitutional actions and inactions alleged herein.

160.    The corporate policies, practices, and customs described above were the moving force behind Ms. Barlow-Austin's suffering and death and the constitutional violations alleged herein. The Corporate Defendants also ratified the unconstitutional conduct of its employees and agents in connection with the death of Ms. Barlow-Austin. LaSalle policymakers were aware of her condition and participated in the decision not to take her to the hospital until it was too late. In

addition, following Ms. Barlow-Austin's death, LaSalle engaged in deceptive actions to cover up what happened. This included failing to inform Ms. Barlow-Austin's family when she was hospitalized in critical condition, failing to preserve relevant evidence, and failing to report her death to state authorities.

161.    LaSalle attempted to circumvent the state mandated in-custody death reporting requirement by releasing Ms. Barlow-Austin from custody at the hospital when death was imminent—later claiming that it didn't have to report her death because she technically wasn't "in-custody" when she died. The Texas Commission on Jail Standards later learned of her death from a third-party source and requested information from LaSalle. LaSalle only provided the commission a limited amount of information and failed to provide it with the shocking video footage cited above. Still, on October 15, 2019, the TCJS found LaSalle to be out of compliance with jail standards for not following the instructions of designated physicians, not dispensing prescription medications, and not verifying the medication that Ms. Barlow-Austin's husband delivered to the jail on behalf of his loved one.

162.    All acts and omissions committed by the Corporate Defendants were committed with intent, malice, deliberate indifference, and/or with reckless disregard for Ms. Barlow-Austin's federal constitutional rights. And the acts of and omissions of the Corporate Defendants caused the damages alleged herein.

163.    Moreover, the conditions in which LaSalle confined Holly Barlow-Austin were inhumane in the extreme, beyond all bounds of human decency, and in flagrant violation of her constitutional rights. Housing her in such deplorable conditions was arbitrary, purposeless, and bore no reasonable relationship to any legitimate penological or government objective.

**C.**     **Additional Facts Applicable to Bowie County**

164.    Defendant Bowie County delegated its final policy-making authority to the Corporate Defendants. Despite this, Bowie County had a continuing duty to ensure that its corporate policymakers were meeting the constitutional needs of its detainees. Bowie County adopted and ratified the policies, customs, and practices of the Corporate Defendants as its own. As such, Defendant Bowie County is liable for any unconstitutional corporate policies, customs, or practices that resulted in harm to any detainees and inmates confined in the jail, including the those that caused the suffering and death of Holly Barlow-Austin. It was foreseeable that such policies, customs, and practices would put the lives of Bi-State Jail and detainees at risk, and such policies and customs caused and/or substantially contributed to the suffering and death of Ms. Barlow-Austin.

165.    Bowie County is also liable for failing to regularly inspect the Bi-State Jail to ensure that LaSalle was meeting its constitutional obligations. Given the highly publicized evidence of how inmates were being treated, including those who died in the years leading up to 2019, Bowie County was on notice that LaSalle was not complying with minimal constitutional standards. It had a constitutional duty to remedy the situation, and it breached its duty.

166.    In addition, Bowie County is directly liable for the constitutional violations committed by its sheriff, James Prince, who had final policymaking authority on behalf of the county. Sheriff Prince became aware of Ms. Barlow-Austin's serious medical needs in late May 2019—when her husband reported detailed and specific concerns to him about his wife's condition and her lack of adequate medical care by the LaSalle medical staff. As Bowie County Sheriff, he had the duty to personally investigate the concerns reported to him by Ms. Barlow-Austin's

husband and the power to intervene by ordering hospital transport. Yet, he failed to act upon the information provided to him. In so doing, he knowingly put Ms. Barlow-Austin at substantial risk of serious harm.

## V.   CAUSES OF ACTION

### A.   Against the Corporate Defendants

167.   Based on the allegations in this complaint, the Corporate Defendants (LaSalle and LaSalle Management) are liable under 42 U.S.C. § 1983 for violating the plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes depriving Holly Barlow-Austin of her constitutional rights to adequate medical care and to be housed in humane conditions of confinement, as well as depriving her surviving family members of their constitutional liberty interest in their relationship and their society and companionship with her.

### B.   Against Bowie County

168.   Based on the allegations in this complaint, Bowie County is liable under 42 U.S.C. § 1983 for violating the plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes depriving Holly Barlow-Austin of her constitutional rights to adequate medical care and to be housed in humane conditions of confinement, as well as depriving her surviving family members of their constitutional liberty interest in their relationship and their society and companionship with her.

### C.   Against the Individual Defendants

169.   Based on the allegations in this complaint, all individual defendants are liable under 42 U.S.C. § 1983 for violating the plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes depriving Holly Barlow-Austin of her

constitutional rights to adequate medical care and to be housed in humane conditions of confinement, as well as depriving her surviving family members of their constitutional liberty interest in their relationship and their society and companionship with her.

170.    Individual liability under 42 U.S.C. § 1983 also extends to the supervisory defendants identified herein, including Defendants Reynolds, McCann, Foltz, and Arnold for their failure to oversee their subordinates and ensure compliance with correctional standards of care as described in this complaint.

## V.       JURY DEMAND

171.    Plaintiffs hereby demand a trial by jury.

## VI.      PRAYER FOR RELIEF

Plaintiffs ask that the Court award them the following relief:

A.      All available compensatory damages, including, but not limited to: damages to Holly Barlow-Austin for her mental and physical pain and suffering and the loss of the value of her life; medical expenses; damages to her husband and her parents, for their loss of society and companionship, loss of love and affection, loss of financial support, loss of household services, and loss of care, comfort, and guidance; mental and emotional anguish; and all compensatory damages available under federal law;

B.      Punitive damages against all individual and corporate defendants;

C.      Attorneys' fees and costs;

D.      Prejudgment interest as appropriate; and

E.      Any such other relief that this Court deems just and equitable.

DATED this 16th day of September, 2020.

Respectfully submitted,

BUDGE & HEIPT, PLLC

MERCY CARTER, LLP

___*/s/ Erik J. Heipt*_____
Erik J. Heipt
Edwin S. Budge
705 2nd Ave., Suite 910
Seattle, Washington 98104
ed@budgeandheip.com
erik@budgeandheipt.com
Telephone: (206) 624-3060

Attorneys for Plaintiffs

___*/s/ David Carter*_____
David Carter
1724 Galleria Oaks Dr.
Texarkana, Texas 75503
wdcarter@texarkanalawyers.com
Telephone: (903) 794-9419
Texas Bar No.: 03932780

Attorneys for Plaintiffs