**IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| MARY MARGARET MATHIS, | § | |
| individually and as Administrator of the | § | |
| ESTATE OF HOLLY BARLOW-AUSTIN; | § | |
| and MICHAEL GLENN AUSTIN, | § | |
| individually | § | |
| | § | |
| v. | § | CASE NO. 5:20cv146-RWS-CMC |
| | § | |
| SOUTHWESTERN CORRECTIONAL, | § | |
| LLC d/b/a LASALLE CORRECTIONS, | § | |
| LLC and LASALLE SOUTHWEST | § | |
| CORRECTIONS; et al. | § | |

## MEMORANDUM ORDER

The above-entitled and numbered civil action was heretofore referred to United States

Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636.  The Report of the Magistrate

Judge which contains her proposed findings of fact and recommendations for the disposition of such

action has been presented for consideration. Defendants[1] filed objections to the Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(C).  Mary Margaret Mathis, individually and

as administrator of the Estate of Holly Barlow-Austin, and Michael Glenn Austin, individually

(collectively "Plaintiffs"), filed a response to the objections. The Court conducts a *de novo* review

of the Magistrate Judge's findings and conclusions.

## BACKGROUND

This is a civil rights action under 42 U.S.C. § 1983 resulting from events that happened

during the confinement of Holly Barlow-Austin ("Ms. Barlow-Austin") at the Bi-State Justice Center

---

[1] For purposes of this Order, Defendants are Southwestern Correctional, LLC d/b/a LaSalle Corrections, LaSalle Management Company, LLC, Bowie County, Texas, Michelle Arnold, Tiffany Hill, Markesha Jones, Amanda Hughes, and Brittany Cooksey and do not include Timothy Reynolds, M.D., Steven Foltz, and James McCann, which are represented by separate counsel.

Jail ("Bi-State Jail") and a related facility, known as the Annex, which are run by the same private, for-profit correctional healthcare corporation: LaSalle Corrections. Docket No. 16 , ¶ 1. A resident of Texas, Ms. Barlow-Austin was arrested by the Texarkana, Texas Police Department on April 5, 2019 for a probation violation and brought to the Bi-State Jail and the Annex as a pretrial detainee, where she remained until her death on June 17, 2019. *Id.*, ¶¶ 1, 23-24.

Plaintiffs allege Defendants are liable under 42 U.S.C. § 1983 for violating Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution, by depriving Ms. Barlow-Austin of adequate medical care, housing her in inhumane conditions of confinement, as well as depriving her surviving family members of their constitutional liberty interest in their relationship and their society and companionship with her. *Id.*, ¶¶ 167-69. According to Plaintiffs, Defendants' unconstitutional actions include denying Ms. Barlow-Austin vital prescription medication, failing to monitor and treat her life-threatening medical needs, failing to transport her to the hospital until it was too late to save her life, housing her in deplorable and inhumane conditions of confinement, depriving her of water, forcing her to endure extreme and pointless pain and suffering, causing her death, and robbing her surviving family members of their relationship with her. *Id.*,  ¶ 2.

Plaintiffs ask the Court to award them the following relief: (1) all available compensatory damages, including, but not limited to: damages to Ms. Barlow-Austin for her mental and physical pain and suffering and the loss of the value of her life; medical expenses; damages to her husband and her parents, for their loss of society and companionship, loss of love and affection, loss of financial support, loss of household services, and loss of care, comfort, and guidance; mental and emotional anguish; and all compensatory damages available under federal law; (2) punitive damages

2

against all individual and corporate defendants; (3) attorneys' fees and costs; (4) prejudgment interest as appropriate; and (5) any such other relief the Court deems just and equitable. *Id.* at p. 56.

## REPORT AND RECOMMENDATION

On June 15, 2021, the Magistrate Judge issued a 90-page Report and Recommendation ("R&R"). Docket No. 47. In the R&R, the Magistrate Judge considered the following separate motions: (1) Rule 12(b)(6) Motion to Dismiss For Failure to State A Claim and Qualified Immunity by Amanda Hughes, Markesha Jones, Tiffany Hill, and Michelle Arnold (Docket No. 21); (2) Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim by Southwestern Correctional, LLC d/b/a LaSalle Corrections, LaSalle Management Company, Bowie County, Texas, Amanda Hughes, Markesha Jones, Tiffany Hill, Brittany Cooksey and Michelle Arnold (Docket No. 20); and (3) Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim by LaSalle Management Company, LLC (Docket No. 22). The Magistrate Judge recommended Defendants' motions be denied.

After setting forth in detail the pertinent allegations from Plaintiffs' lengthy Second Amended Complaint ("SAC"), which the Magistrate Judge accepted as true for purposes of ruling on Defendants' motions to dismiss, *id.* at pp. 17-34, the Magistrate Judge considered the motion to dismiss filed by Defendants Amanda Hughes, Markesha Jones, Tiffany Hill, and Michelle Arnold (collectively, "Nurse Defendants"). Nurse Defendants contend Planitiffs have failed to state a claim against them. *See* Docket No. 21 at pp. 5-16. Assuming a claim has been stated, Nurse Defendants assert they are entitled to qualified immunity. *Id.* at pp. 16-25.

In recommending Nurse Defendants' motion be denied, the Magistrate Judge first considered the nature of Plaintiffs' claims. According to the Magistrate Judge, while Plaintiffs assert the SAC "alleges two theories of liability against LaSalle Management: a conditions-of-confinement claim

and an 'episodic acts' claim," (R&R at p. 43 (quoting Docket No. 28 at p. 7), it is less clear with regard to the individual nursing defendants whether Plaintiffs intend to assert a conditions of confinement claim in addition to an episodic acts or omissions claim. R&R at pp. 44-45. However, for purposes of the R&R, the Magistrate Judge considered, in addressing Nurse Defendants' motion, both alleged episodic acts and omissions and alleged unconstitutional conditions of confinement. *Id.* at p. 45.

Regarding the conditions of confinement claim, the Magistrate Judge concluded as follows:

At the Rule 12(b)(6) motion to dismiss stage, the Court is not convinced Plaintiffs have failed to state a conditions of confinement claim, whether based on inadequate food, water, shelter, or medical care. Therefore, the Court recommends Nurse Defendants' motion to dismiss any conditions of confinement claim be denied at this time.

*Id.* at p. 49.

Turning to the episodic acts or omissions claim, the Magistrate Judge held as follows:

Plaintiffs argue the SAC contains sufficient factual allegations to plausibly show that the risk of harm to Austin was obvious and that each of the nursing defendants refused to treat her, ignored her complaints, intentionally mistreated her, and wantonly disregarded her serious medical needs. Docket Entry # 26 at p. 25. According to Plaintiffs, while the SAC does not list the date and time of every interaction that the defendant-nurses had with Ms. Barlow-Austin, it plainly alleges (1) they were all employed by LaSalle at all material times, (2) they were responsible for providing medical care to inmates at the Bi-State Jail, (3) Austin was their patient, (4) they had access to her medical history and patient chart and a duty to familiarize themselves with it, (5) they all knew of her HIV+ status and her susceptibility to deadly fungal infections, (6) Austin became very sick about a week into her confinement as a result of the nursing staff's failure to give her the prescription medication that her husband had brought to them, (7) from April 13th to June 11th, her condition steadily deteriorated, (8) she began submitting a series of medical request forms (kites), which went into her patient-chart, (9) Nurse Defendants knew that Austin's dangerously low CD4 count indicated a severely compromised immune system, (10) they all knew that by late April, Austin was suffering from severe and persistent head and neck pain, numbness in her limbs, dizziness, high blood pressure, and frequent fainting spells (causing a head/face injury on one occasion), (11) they

4

all knew that by mid-May, Austin required the use of wheelchair due to her difficulty ambulating and that she was experiencing profound vision loss, and (12) they knew that by early June, Austin was physically disabled, unable to walk, and completely blind. *Id.* at pp. 25-26.

Plaintiffs assert it is 'important not to lose sight of the fact that Ms. Barlow-Austin is dead, so she cannot provide us with the dates and times of each encounter with each nurse.' Docket Entry # 26 at p. 26.  According to Plaintiffs, this 'asymmetry of information' in jail death cases weighs against dismissal under Rule 12(b)(6). *Id.* (citing *Estate of Walter v. Corr. Healthcare Cos.*, 232 F. Supp. 3d 1157, 1164 n.5 (D. Colo. 2017)). Additionally, Plaintiffs point out Austin's death occurred in a jail, which is sealed off from the public, 'making it difficult for surviving family members to obtain a complete set of records.' *Id.* Plaintiffs contend the SAC provides the Court with enough information to draw reasonable inferences in Plaintiffs' favor, 'using its judicial experience and common sense, and find that the factual allegations contained therein are sufficient to raise a reasonable expectation that discovery will reveal evidence of the claims alleged.' *Id.* at p. 27. The Court agrees.

According to the Supreme Court, the requisite state of mind in deliberate indifference cases is a 'question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' *Farmer* [*v. Brennan*, 511 U.S. 825, 842 (1994)]. In cases involving inadequate medical care, the Fifth Circuit has listed several additional ways of establishing deliberate indifference: A plaintiff can prove deliberate indifference by showing that (1) a defendant refused to treat her, (2) ignored her complaints, (3) intentionally treated her incorrectly, or (4) engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs. *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017); *Easter v. Powell,* 467 F.3d 459, 464 (5th Cir. 2006); *Domino v. Texas Dept. of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

Further, the individuals who came into contact with Plaintiff were gatekeepers of medical care, not treating physicians. LVNs and guards at the Bi-State Jail 'serve as a gatekeeper for other medical personnel capable of treating the [detainee's] condition, and if [they] delay[] or refuse[] to fulfill that gatekeeper role . . . it stands to reason that [they] also may be liable for deliberate indifference for denying access to medical care.' *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Similar to District Judge Schroeder in the *Jones* case (Cause No. 5:19cv104, Docket Entry # 143 at pp. 11-12), the Court finds *Rodrigue v. Grayson* instructive here. There, the Fifth Circuit upheld the district court's finding that failure by a licensed practical nurse (LPN) to refer an inmate to the prison's medical doctor despite persistent complaints of extreme pain and symptoms for over a week constituted deliberate

indifference. *Id.* The district court explained its finding that the LPN was not entitled to qualified immunity as follows:

> [I]t is important to specify that the question is not whether [the LPN] is liable for failing to recognize that Rodrigue had acute appendicitis. As previously discussed, a LPN is not authorized to make a diagnosis. However, a LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care. LPN Grayson knew that Rodrigue's complaints showed that he was at risk of serious harm. She simply decided not to respond to that risk. This is not a case where an inmate saw a physician and that physician made an unfortunately incorrect medical decision . . . . In this case, despite persistent complaints of extreme abdominal pain and bilious vomiting for over a week, a prisoner was simply denied access to a medical professional competent to diagnose and treat his condition. The Court is convinced that this conduct rose to the level of a wanton disregard for Rodrigue's serious medical needs . . . . When a gatekeeper to emergency care, like LPN Grayson, knowingly disregards a prisoner's complaints, she acts with deliberate indifference to that prison's medical needs.

*Rodrigue v. Morehouse Det. Ctr.*, Civil Action No. 09-985, 2012 WL 4483438, at *6 (W.D. La. Sept. 28, 2012), *aff'd sub nom. Rodrigue v. Grayson*, 557 Fed. Appx. 341 (5th Cir. 2014).

As the SAC alleges, Austin did not suddenly take a turn for the worse during the last forty-eight hours. She was allegedly unable to walk and had vision loss weeks before then. According to Plaintiffs, it 'defies logic to think that, somehow, in a jail of this size, the nurse on duty—stationed near her cell—would not have frequently seen and interacted with her. It is highly likely that they were all familiar with Austin's condition and extremely serious medical needs throughout her confinement. If not, it suggests that they completely ignored the very presence of their patient, which itself would be indicative of deliberate indifference.' Docket Entry # 26 at p. 27.

Even putting aside the alleged misconduct between mid-April and June 8, 2019, the Court agrees with Plaintiffs the allegations regarding Austin's last few days of her confinement are sufficient to draw a plausible inference of deliberate indifference. Plaintiffs allege the conduct of the individual nursing defendants, including Defendants Hill, Hughes, Jones, and Arnold, was 'particularly abhorrent in the last 48 hours of Ms. Barlow-Austin's confinement.' Docket Entry #16, ¶ 128. By then, she was not only gravely ill, but she was also severely dehydrated and malnourished. *Id.* She was so visibly emaciated that her bones were jutting out. *Id.*

In summary, the Court finds Plaintiffs have sufficiently alleged Nurse Defendants acted with deliberate indifference to Plaintiff's serious medical needs. Therefore, the Court recommends Nurse Defendants' motion to dismiss any episodic acts or omissions claims for failure to state a claim be denied.

*Id*. at pp. 55-59 (internal footnote omitted).

Having determined Plaintiffs have sufficiently alleged their claims against Nurse Defendants, the Magistrate Judge then considered whether Nurse Defendants are entitled to qualified immunity. *Id.* at p. 59. Relying on a recent Fifth Circuit case, *Sanchez v. Oliver*, 995 F.3d 461 (5th Cir. 2021), the Magistrate Judge concluded Nurse Defendants are not entitled to qualified immunity. *Id.* at pp. 60-64.

The Magistrate Judge then considered the motion to dismiss filed by Southwestern Correctional, LLC d/b/a LaSalle Corrections; LaSalle Management Company, LLC; Bowie County, Texas; Amanda Hughes; Markesha Jones; Tiffany Hill; Brittany Cooksey; and Michelle Arnold (collectively, "LaSalle Defendants"). In their motion, LaSalle Defendants argue Plaintiffs have failed to state a claim under 42 U.S.C. § 1983 against Defendants for the deprivation of their constitutional liberty interest in their relationship and their society and companionship with Ms. Barlow-Austin. Docket No. 20 at p. 2. According to LaSalle Defendants, the issue is whether Plaintiffs have stated a cause of action for a substantive due process violation of their alleged constitutional familial liberty interest in their relationship, society, and companionship with Austin. Docket No. 30 at pp. 2-3. LaSalle Defendants assert such claims based upon a substantive due process theory are not allowed. *Id.* at p. 3.

LaSalle Defendants argue "Plaintiffs fail to recognize the distinction between their claim as pled - substantive due process violation of their alleged constitutional familial liberty interest in their

relationship, society and companionship with Austin - and a claim for wrongful death." *Id.* at p. 4. Thus, LaSalle Defendants assert the cases relied upon by Plaintiffs have "no bearing whatsoever on the Plaintiffs' claims, as pled in their Complaint." *Id.* at p. 3.

In her R&R, after setting out additional allegations applicable to the Corporate Defendants, R&R at pp. 64-68, the Magistrate Judge discussed applicable case law, *id.* at pp. 69-74, ending with a discussion of *Saenz v. City of El Paso, Tex.*, Civil Action No. EP-14-CV-244-PRM, 732015 WL 4590232 (W.D. Tex. Jan. 28, 2015), *aff'd sub nom. Saenz v. Flores*, 668 Fed. Appx. 611 (5th Cir. 2016).[2] *Id.* at pp. 73-75. The Magistrate Judge concluded as follows:

> Having carefully reviewed the applicable law from within the Fifth Circuit, the Court

---

[2] In *Saenz v. City of El Paso, Tex.*, Civil Action No. EP-14-CV-244-PRM, 732015 WL 4590232 (W.D. Tex. Jan. 28, 2015), *aff'd sub nom. Saenz v. Flores*, 668 Fed. Appx. 611 (5th Cir. 2016), the decedent's mother filed suit in her individual capacity and on behalf of the estate of Daniel Saenz, seeking recovery under § 1983 for three alleged violations of her and Saenz's constitutional rights: "violation of Saenz's right to be free from unreasonable seizures under the Fourth Amendment, violation of Saenz's due process rights under the Fourteenth Amendment, and violation of Plaintiff's 'constitutional interest in familial companionship and society with the decedent' under the Fourteenth Amendment." *Id.* at *1.

The defendant-officer filed a motion to dismiss, asserting (among other things), the "deprivation of familial companionship and society . . . has not been specifically recognized as a cause of action in the Fifth Circuit." *Id.* at *2, *6. The U.S. District Court for the Western District of Texas disagreed, noting the *Rhyne* and *Grandstaff* cases. *Id.* at *6. Although the defendant acknowledged that in this circuit, "individuals who are within the class of people entitled to recover under Texas's wrongful death statute have standing to sue under § 1983 for their own injuries resulting from the deprivation of decedent's constitutional rights," the defendant faulted the plaintiff "for not citing Texas's wrongful death statute in her Second Amended Complaint and for failing to 'plead with any particularity allegations to substantiate the claim.'" *Id.* As noted by the Magistrate Judge, the district court rejected this argument:

> > First, it was sufficient for purposes of Federal Rule of Civil Procedure 12(b)(6) for Plaintiff to have cited § 1983, which incorporates Texas's wrongful death statute and gives rise to her cause of action. Second, Plaintiff offered sufficient factual allegations to state a claim of deprivation of society and companionship of her child. Plaintiff asserted that (1) she 'is the mother of DANIEL SANEZ,' (2) Defendant Flores 'shot and killed Daniel Saenz,' and (3) she 'suffered injuries, damages and losses as a result of [the] deprivation of' her child's society and companionship-specifically, his 'love, affection, advice, counsel, care, consortium, protection, services, attention, society and companionship.' Second Am. Compl. 1, 6, 12–13, 22. Though Defendant Flores characterizes Plaintiff's pleadings as inadequate, the Court is hard pressed to imagine what other factual allegations Plaintiff should be required to offer for purposes of stating this claim.

*Id.* (internal footnote omitted in R&R).

rejects LaSalle Defendants' argument that Plaintiffs are required to assert a supplemental state law wrongful death claim in order to seek any loss of relationship-type damages for the death of Austin. In the SAC's prayer for relief, Plaintiffs ask the Court to award Austin's surviving spouse and mother damages 'for their loss of society and companionship, loss of love and affection, loss of financial support, loss of household services, and loss of care, comfort, and guidance; mental and emotional anguish; and all compensatory damages available under federal law[.]' Docket Entry # 16, ¶ 171. As held by the court in *Saenz*, it is sufficient for purposes of Federal Rule of Civil Procedure 12(b)(6) for Plaintiffs to have cited § 1983, which incorporates Texas's wrongful death statute and gives rise to their cause of action. *Saenz*, 2015 WL 4590232, *6. Additionally, Plaintiffs have offered sufficient factual allegations to state a claim of deprivation of society and companionship. Similar to the court in *Saenz*, 'the Court is hard pressed to imagine what other factual allegations Plaintiff[s] should be required to offer for purposes of stating this claim.' *Id*.

*Id*. at pp. 75-76 (internal footnote omitted).

Finally, the Magistrate Judge considered a separate motion to dismiss for failure to state a claim filed by LaSalle Management Company, LLC ("LaSalle Management"), the parent company of Southwestern Correctional, LLC d/b/a LaSalle Corrections ("LaSalle"). In its motion, LaSalle Management asserts a parent company is not liable for its subsidiaries actions, and the "only factual allegation regarding LaSalle Management that could impute liability is the claim that it is the parent company of" LaSalle. Docket No. 22 at p. 4. According to LaSalle Management, Plaintiffs allege LaSalle, not LaSalle Management, is responsible for operating the Bi-State Jail and Annex; otherwise, the SAC "is devoid of any allegations that suggest LaSalle Management deprived Austin of any rights or was acting under color of state law." *Id.* LaSalle Management concludes as follows:

Plaintiffs' bare allegation that LaSalle Management is the parent company of LaSalle is not sufficient to suggest LaSalle Management is directly liable under § 1983 or liable for the acts of its subsidiary, LaSalle. Accordingly, plaintiffs' claims against LaSalle Management fail to meet the plausibility standard that governs this Rule 12(b)(6) motion to dismiss. LaSalle Management respectfully requests this Court grant their Motion to Dismiss and enter an Order dismissing the . . . claims against LaSalle Management, with prejudice.

*Id.* at p. 5.

The Magistrate Judge started her analysis with the following:

Here, the issue before the Court is whether Plaintiffs have sufficiently pleaded a claim for relief against LaSalle Management. After identifying the Corporate Defendants (which includes LaSalle and LaSalle Management) and the other parties, the SAC sets forth forty-seven pages of factual allegations. *See* Docket Entry # 16, ¶¶ 22-166. This part of the complaint is divided into three sections, the first of which is entitled: 'Facts Applicable to *All* Defendants.' *Id.* at p. 8 (emphasis added).

The next section of the factual allegations is entitled 'Additional Facts Applicable to the Corporate Defendants.' *Id.* at p. 40. This section contains detailed allegations pertaining to LaSalle and LaSalle Management. According to Plaintiffs, the unconstitutional acts and omissions described in the complaint (including those set forth in paragraphs 22-129) 'were carried out in accordance with the official policies, procedures, practices, and customs of the Corporate Defendants (LaSalle *and* LaSalle Management).' *Id.*, ¶ 130 (emphasis added). 'These *corporate* policies, procedures, practices, and customs, which are described in more detail below, were the moving force behind the unconstitutional actions that led to Ms. Barlow-Austin's pre-death pain and suffering and her death.' *Id.* (emphasis added).

The SAC then goes on to describe the alleged unconstitutional practices and customs of the Corporate Defendants. *Id.*, ¶ 131. As noted above, the SAC alleges multiple other deaths that occurred in the Bi-State Jail, beginning with the death of Michael Sabbie in July 2015. *See id.*, ¶¶ 132-141. 'Despite each of these tragic outcomes, most of which resulted in death, LaSalle failed to correct the unconstitutional policies, practices, and customs that caused them to happen. And, as expected, the systemic constitutional deficiencies continued.' *Id.*, ¶ 142. The complaint alleges that '[t]he unconstitutional policies, practices, and customs . . . have not been limited to the Bi-State Jail and have caused unnecessary suffering and deaths in multiple other LaSalle-run Texas facilities.' *Id.*, ¶ [] 143.

As further noted above, the SAC sets forth allegations regarding multiple deaths at 'other correctional facilities run by the Corporate Defendants.' *See id.*, ¶¶ 132, 143-147. After detailing the events surrounding these deaths, the Second Amended Complaint describes LaSalle's 'continual noncompliance issues,' its practice of hiring 'a disproportionate number of 'temporarily licensed" corrections officers,' its failure to train its staff, its persistent pattern of falsifying training records, its insufficient staffing, its failure to take inmates with life-threatening medical needs to the hospital, its failure to monitor inmates on 'medical observation,' its corporate culture of treating all inmates as 'fakers' and denying them medical care on this basis, its poor corporate record-keeping, and its longstanding practice of failing to

10

communicate important information about patient-inmate care needs. *Id.*, ¶¶ 148-157.

R&R at pp. 82-84.

After setting forth additional allegations in the SAC regarding Corporate Defendants, *id.* at

pp. 84-85, the Magistrate Judge noted Plaintiffs' argument this is not LaSalle Management's "first

attempt at this failed argument." *Id.* at p. 85 (citing Docket No. 28 at p. 8 (citing *Sabbie v.*

*Southwestern Corr., LLC*, Cause No. 5:17cv113-RWS-CMC)).[3] The Magistrate Judge then

considered, and rejected, the additional arguments raised by LaSalle Managment in its reply in this

case. Specifically, the Magistrate Judge held as follows:

> According to the reply, of the thirty-four paragraphs under the heading 'Corporate
> Defendants,' 'there is only one mention of LaSalle Management, and that is in
> paragraph 130 and only to identify that Plaintiffs are defining "Corporate
> Defendants" to include LaSalle and LaSalle Management.' Docket Entry # 31 at pp.
> 4-5. 'Otherwise, within these 34 paragraphs there are only seven references to
> "Corporate Defendants" – Paragraphs 130, 131, 132, 158, 159, 160, and 162. Every
> other paragraph is directed only at LaSalle, not LaSalle Management.' *Id.* at p. 5.
> LaSalle Management asserts that 'once you strip away the conclusory allegations
> unsupported by factual context and look at the relevant factual allegations, the only
> well-pleaded allegation against LaSalle Management is that it is the parent company
> of LaSalle.' *Id.* at p. 7.

> According to LaSalle Management, given the allegations in the SAC that LaSalle
> 'manages the day-to-day operations of the Bi-State Jail and the Annex' and 'run[s]
> all aspects' of the Facility, Docket Entry # 16, ¶¶ 10-11, it is not plausible that
> LaSalle Management, a wholly separate legal entity, implemented any policies that
> allegedly caused the underlying constitutional violation. Docket Entry # 33 at p. 7.
> LaSalle Management asserts Plaintiffs 'cannot meet the plausibility standard by

---

[3] In *Sabbie*, the Magistrate Judge addressed a motion for summary judgment filed by LaSalle Management, wherein LaSalle Management argued it did "not manage or operate the Bi-State Jail or Bowie County Correctional Facility in any way." *Sabbie v. Southwestern Corr., LLC*, Cause No. 5:17cv113-RWS-CMC, Docket No. 122 at p. 149. The undersigned rejected this argument based, in part, on the fact that LaSalle Management signed an addendum to the contract to operate the Bi-State Jail, which indicated that LaSalle Management guaranteed the "performance of all obligations and duties," including the contract's obligations for complete and total operation of the Bi-State Jail. *Id.* at p. 152. Considering all the evidence in the light most favorable to the plaintiffs in the *Sabbie* case, the undersigned recommended that "LaSalle Management's motion for summary judgment be denied." *Id.* at p. 153.

simply lumping LaSalle and LaSalle Management together at the end of their Complaint to conclude that everything badthat allegedly occurred was done per the policies of the "Corporate Defendants" – there is no alleged role for LaSalle Management to implement any policies.' *Id.*

The Court disagrees. The detailed allegations pertaining to Austin's confinement in the 'Facts Applicable to All Defendants' section of the SAC are factual allegations against LaSalle Management, and as urged by Plaintiffs in their surreply, they provide 'critical factual context to paragraph 131 of the operative complaint.' Docket Entry # 34 at p. 4. Additional context comes after paragraph 131, where the SAC describes multiple deaths that occurred in the Bi-State Jail and other jails run by LaSalle and LaSalle Management, beginning with the death of Michael Sabbie in July 2015. *See id.*, ¶¶ 133-147. This portion of the complaint alleges as follows:

> As of the time of Ms. Barlow-Austin's confinement, there had been multiple instances in the Bi-State Jail (and in other correctional facilities run by the ***Corporate Defendants***) of inmates being systemically denied constitutionally adequate medical care by LaSalle and its agents or employees. Several of these instances involved high-profile lawsuits about which the ***Corporate Defendants*** were acutely aware, including those that were covered by local and national media outlets, putting company policymakers on notice that the Bi-State Jail and other LaSalle-run facilities were engaging in practices that endangered the lives of inmates.

*Id.*,¶ 132 (emphases added).

According to Plaintiffs, the other deaths are relevant because establishing an episodic-acts claim against an entity-defendant requires a plaintiff to show that a policy, practice, or custom was the 'moving force' behind an unconstitutional act. *See Balle v. Nueces County*, 952 F.3d 552, 559 (5th Cir. 2017). Plaintiffs assert these incidents, which are described in factual detail, show that LaSalle and LaSalle Management had a *de facto* policy (*i.e.*, pattern, practice, or custom) of similar unconstitutional misconduct. In addition, among other allegations, the SAC provides as follows:

> As was the case with other inmates who died in LaSalle-run facilities, the failure to secure needed medical care for Ms. Barlow-Austin was motivated, in part, by constitutionally impermissible profit-driven reasons. The ***Corporate Defendants*** had a practice of submitting unrealistically low bids to get jail contracts. After securing the contracts, they would then cut costs, or keep their budgets unrealistically low, to make money. This included hiring

> inexperienced jail guards and lower-level nurses and failing to invest in adequate training. It also included spending inadequate amounts on correctional medical care and habitually understaffing its facilities. It was foreseeable that LaSalle's inadequate training, insufficient medical spending, and understaffing would cause harm to inmates and detainees in need of medical care. In fact, these reckless profit-driven practices resulted in substantial harm to multiple inmates in the years leading up to Ms. Barlow-Austin's confinement. And these same unconstitutional practices caused her unnecessary suffering and death.

Docket Entry # 16, ¶ 158 (emphasis added). When considered in the context of the entire complaint, these allegations are well-pleaded and contain factual content that allows the Court to draw the reasonable inference that the policies, customs, and constitutionally impermissible profit-driven practices of LaSalle Management led to the underlying constitutional violation.

LaSalle Management further claims it can only be liable if it had final policy-making authority. However, as pointed out by Plaintiffs, the SAC alleges that 'Defendant Bowie County delegated its final policy-making authority to the Corporate Defendants,' Docket Entry # 16 at ¶ 164, which, by definition, includes LaSalle Management.

In sum, accepting all well-pleaded facts as true and viewing them in the light most favorable to Plaintiffs, the Court finds Plaintiffs have stated a plausible claim against LaSalle Management. *See Sabbie v. Sw. Corr., LLC*, Civil Action No. 5:17CV113-RWS-CMC, 2017 WL 5907865, at *7 (E.D. Tex.Nov. 6, 2017), *report and recommendation adopted*, No. 5:17-CV-113-RWS-CMC, 2017 WL 5905270 (E.D. Tex. Nov. 30, 2017). The Court recommends LaSalle Management's motion to dismiss be denied.

R&R at pp. 86-89.

## OBJECTIONS

Defendants filed objections to the R&R, and Plaintiffs filed a response to the objections.

Before turning to its *de novo* review, the Court notes the voluminous allegations are set forth in

detail in the R&R and are not duplicated herein.  Nor does the Court duplicate herein the applicable

law set forth in detail by the Magistrate Judge in pages 11-17 of the R&R. The Court will incorporate

the pertinent facts and law in its discussion of Defendants' objections.

## APPLICABLE STANDARD

The Federal Rules of Civil Procedure require each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The court must then determine whether the complaint states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of

14

a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Paul Wilson, et al., Plaintiffs, v. Holly Burns, in her official & individual capacity, et al., Defendants*, Civil Action No. 4:20-CV-3128, 2021 WL 2226194, at *1 (D. Neb. June 2, 2021) (citing *Iqbal*, 556 U.S. at 678). The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *Id.* (citing *Twombly*, 550 U.S. at 545). The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* (citing *Twombly*, 550 U.S. at 556). But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* (citing *Iqbal*, 556 U.S. at 678).

Generally, a court should not dismiss an action for failure to state a claim under Rule 12(b)(6)

15

without giving the plaintiff an opportunity to amend. *Walker v. Beaumont Indep. Sch. Dist.*, Civil Action No. 1:15-CV-379, 2016 WL 6666828, at *16 (E.D. Tex. Mar. 11, 2016), *report and recommendation adopted*, No. 1:15-CV-379, 2016 WL 1156852 (E.D. Tex. Mar. 24, 2016) (citing *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (a plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to refiling); *accord Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003)). Where, however, a claim is frivolous or the "complaint alleges the plaintiff's best case," a further factual statement from the plaintiff need not be allowed. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999); *see also Spiller v. City of Tex. City*, 130 F.3d 162, 167 (5th Cir. 1997).

## *DE NOVO* REVIEW

**Nurse Defendants' motion**

### *Conditions of confinement claim*

In their objections, Nurse Defendants object to the Magistrate Judge's finding that Plaintiffs' episodic acts or omissions claim against them could also properly be characterized as a conditions of confinement claim. According to Nurse Defendants, "the Magistrate Judge struggled with whether a conditions of confinement claim was even asserted against the Defendant Nurses" and correctly recognized that only in rare situations can a plaintiff's allegations support both a conditions of confinement claim and an episodic acts or omissions claim. Docket No. 49 at p. 2 (citing R&R at pp. 40-45). Nurse Defendants assert the SAC pleads little facts to support such a claim against them, and the alleged incidents described in the SAC "fall short of describing any patterns" as required for a conditions of confinement claim. *Id.* at p. 3.

According to Nurse Defendants, there are only two specific incidents described with respect

to the Defendant Nurses in the conditions of confinement discussion (that Nurse Jones attempted to give Ms. Barlow-Austin some water and that Nurse Hughes took Ms. Barlow-Austin's vitals but did not provide food or water). Nurse Defendants argue these "two isolated, unrelated incidents against separate Nurses are insufficient to support a properly pled conditions claim against Jones and Hughes, much less Hill and Arnold." *Id.* at p. 4.

In their response, Plaintiffs assert Nurse Defendants' objections "regurgitate the same arguments they made to Judge Craven." Docket No. 51 at p. 2. Specifically, Plaintiffs contend as follows:

> Once again, they ignore numerous well-plead factual allegations that are set forth in the Second Amended Complaint and detailed in Judge Craven's Report and Recommendation. Likewise, they again ignore multiple inferences favorable to Plaintiffs that can be reasonably drawn from those facts, which Judge Craven appropriately considered. In addition, they misrepresent the Report and Recommendation to make it seem as if the *only* events Judge Craven considered were those that took place in the last 48 hours of Holly Barlow-Austin's confinement—when Her Honor plainly considered events preceding that point. Then, when discussing those last 48 hours, they mischaracterize the evidence of their alleged misconduct, minimize it, take it out of context, and portray it in the light most favorable to themselves.

*Id.* at pp. 2-3 (emphasis original).

As urged by Plaintiffs, in the R&R, the Magistrate Judge set forth numerous factual allegations contained in Plaintiffs' SAC, "which the Court accept[ed] as true" for the purposes of ruling on the motions to dismiss. *Id.* at p. 3. Among the facts properly accepted as true are the following:

- The Nurse Defendants were employed by LaSalle and were responsible for providing medical care to inmates, including Ms. Barlow-Austin. *See* R&R at p. 18.

- "Defendants Hill, Hughes, Jones, and Arnold 'all knew about [Ms. Barlow-

17

Austin's] HIV-positive status and her susceptibility to deadly infections[.]'" *Id.* at p. 19.

- As a result of a denial/delay in receiving her essential prescription medication, Ms. Barlow-Austin "became predictably sick." On April 13, 2019, she began to report multiple symptoms to the nursing staff and was placed on medical observation. *See id.* at p. 21.

- On April 17, 2019, a blood test revealed that Ms. Barlow-Austin's CD4 count was extremely low, indicating a severely compromised immune system. Defendants Hill, Hughes, Jones, and Arnold "knew about her dangerously low CD4 count." *Id.*

- Ms. Barlow-Austin's symptoms worsened in the ensuing days. "Defendants Hill, Hughes, Jones, and Arnold 'knew that by the end of [April], she was suffering from persistent head and neck pain (which she rated 10/10 on the pain scale), dizziness, high blood pressure, and numbness in her legs.'" *Id.* at p. 22.

- "Despite her alarming symptoms, none of the nurses arranged for her to be evaluated by a medical doctor. And nothing was done to treat her high blood pressure." *Id.* (internal citation omitted).

- On May 2, 2019, an outside mental health provider visited Ms. Barlow-Austin, who reported that "she was very sick, that her right arm and leg were often numb, that she had high blood pressure, that she was dizzy, and that she had been passing out." After the visit, the outside provider reported "very serious concerns" to Defendant Arnold, who "callously responded that [Ms. Barlow-Austin] 'pretends to be weak' and 'knows how to play the sickly role.'" *Id.* (internal citations omitted).

- When Defendant Arnold made her remarks, "she knew that [Ms. Barlow-Austin] was HIV-positive, had a dangerously low CD4 count, and had been experiencing a host of alarming signs and symptoms, many of which were medically verifiable." *Id.* at p. 22, n.9.

- "Defendants Hill, Hughes, Jones, and Arnold knew that by the 3rd of May, Ms. Barlow-Austin was 'suffering from nausea, vomiting, blurred vision, and accelerated hypertension and that her ongoing dizziness had caused several fainting episodes—one of which resulted in a head injury.'" *Id.* at p. 23.

- However, the Nurse Defendants "did nothing to treat her high blood pressure." She was not "evaluated by any level of medical provider for over

two weeks" following May 3, 2019, "and none of the Nurse Defendants took a single vital sign during that two-week timeframe." *Id.* (internal citations omitted).

- By May 22nd, "she could no longer walk or stand, and her vision was badly impaired." Defendants Hill, Hughes, Jones, and Arnold were "personally aware" of her "serious symptoms." *Id.* at p. 24.

- On May 31, 2019, Ms. Barlow-Austin was seen by Defendant Hill and another nurse. Despite her previous high blood pressure readings, they did not take any vital signs. Moreover, despite all of her alarming symptoms, they wrote in their notes that Ms. Barlow-Austin was merely suffering from a "tension headache." *See id.* at p. 25 (internal citation omitted).

- "Given [Ms. Barlow-Austin's] 'myriad serious medical symptoms leading up to her May 31st visit—her accelerated hypertension, blurred vision, nausea, vomiting, dizziness, headaches, neck pain and swelling, numbness in her limbs, difficulty standing and walking, fainting episodes (one of which resulted in a head injury), and a CD4 count of 87, which indicates a severely compromised immune system—it was long past the time for the LaSalle to take her to the hospital.'" *Id.*

- Not only did the Nurse Defendants fail to arrange for hospital transport, but "no LaSalle medical provider evaluated her during the following 10 days, and her vital signs were not taken during that timeframe." *Id.* at pp. 25-26.

- Thereafter, Ms. Barlow-Austin's condition worsened. "Defendants Hill, Hughes, Jones, and Arnold were 'personally aware' that '[b]y early June Ms. Barlow-Austin was physically disabled, unable to walk, and completely blind. Despite their 'personal knowledge' of these 'alarmingly serious medical needs,' these defendants (and others) failed to conduct their required visual checks, failed to follow healthcare protocols, failed to document their patient's highly abnormal medical signs and symptoms, failed to keep honest and accurate medical records, failed to administer essential doses of medication, failed to communicate among one another about their patient, failed to report her severe medical needs to higher-level providers—in dereliction of their gatekeeping duty—and failed to call 911 or otherwise secure timely hospital transport." *Id.* at p. 26.

- "Although [Ms. Barlow-Austin's] condition had deteriorated to the point where she could no longer walk, stand, or see, [Defendant Hill] wrote in a progress note on June 7 that [she] 'refused to get up and come to medical.'" *Id.* at p. 27.

- At all times during the last week of Ms. Barlow-Austin's confinement, she was in a medical observation cell. "Embedded within the [Second Amended Complaint] are 66 video clips showing the gravity of her horrifying condition and her dire need for emergency medical care." *Id.* at p. 27, n.10 (citing SAC at ¶¶ 61-108, Exhibits 1-66).

- "From the surveillance footage, it's readily apparent that Ms. Barlow-Austin is in near-constant pain—suffering from an unyielding headache." *Id.* at p. 27.

- On multiple occasions throughout her first day in the "medical observation cell," Ms. Barlow-Austin "tried to get someone's attention by yelling or banging on the door, wall, or observation window." Yet, "no LaSalle nurses responded." *Id.*

- "As of the morning of June 10, 2019, [Ms. Barlow-Austin] had only had two small cups of water in the last 24 hours. She continually clutche[d] empty water even when she [was] crawling from one spot in her cell to another. She was obviously thirsty and dehydrated." *Id.* at p. 28 (internal quotations & citations omitted).

- "On the morning of June 10th, at 8:37 a.m., Defendant Markesha Jones, a LaSalle LVN, came to [Ms. Barlow-]Austin's door and knocked. At the time, [Ms. Barlow-]Austin was laying on her side—holding her head with one hand and clutching an empty water cup with the other. In response to the knock, she extended her hand with the empty water cup in the direction of the door." *Id.* at pp. 28-29 (internal citations omitted). After a brief exchange, Defendant Jones walked away—without giving Ms. Barlow-Austin any water or entering the cell. *Id.* at p. 29.

- "Defendant Jones wrote in a progress note that [Ms. Barlow-]Austin was yelling, 'water' and 'give me some water.' Yet, preposterously, LVN Jones also wrote that she 'offered' water and medication and that Ms. Barlow-Austin 'refused' to take either." *Id.* (internal citation omitted).

- "Defendant Jones failed to take any vital signs or perform any sort of medical evaluation" of Ms. Barlow-Austin "when even a cursory exam would've shown that Ms. Barlow-Austin was in extreme pain, could not walk, could barely crawl, had lost all vision, and was dehydrated and visibly malnourished. . . . [A]ny lay person would've easily recognized [Ms. Barlow-Austin] needed emergency medical attention. Yet, LVN Jones consciously chose to disregard her dire medical needs." *Id.* (internal citations and

quotations omitted).

- "According to LaSalle records, [Ms. Barlow-Austin] had been 'exhibiting abnormal behavior throughout the day [of June 10th].' For example, she was heard yelling, 'I'm trapped in here. Let me out.' She was also heard yelling, 'I need a fireman. I can't hear the fireman.' Thus, in addition to everything else, she was now suffering from mental confusion and delirium. Defendant Jones notified LaSalle Defendant LPN Hill of [Ms. Barlow-]Austin's abnormal behavior, and Defendant Hill, in turn, notified Defendant Arnold about the situation. However, 'not one of these so-called healthcare providers did anything in response to her ongoing crisis.'" *Id.* at p. 30 (internal citations omitted).

- "On the night of June 10, 2019, at 10:22 p.m., Defendant LVN Hughes entered [Ms. Barlow-]Austin's cell and saw her lying on the filthy floor. It was the first time a nurse had entered in the 38 hours [she] had been in this purported medical observation cell. Defendant Hughes proceeded to check [Ms. Barlow-]Austin's vitals for the first time in over two weeks. [Her] heartrate was abnormally high at 130 beats per minute, and her blood pressure was 177/123, which indicates a hypertensive crisis. In addition, it was obvious that she was physically disabled, uncoordinated, disoriented, malnourished, and blind. This should have triggered an immediate 911 call. *Id.* But it did not." *Id.* (internal citations omitted).

- "After checking her vitals, Defendant Hughes exited the cell, leaving her patient alone inside. 'Not only that, but there's nothing in the records to indicate that she reported her alarming findings to a higher-level medical provider.'" *Id.* at pp. 30-31 (internal quotations & citations omitted).

- "Following this defendant-nurse's visit, no one brought [Ms. Barlow-]Austin any food or water. She remained 'in the same squalid jail cell, with no blanket or pillow—barely able to crawl, blind, weak, lethargic, uncoordinated, unbalanced, disoriented, gaunt, shrunken.'" *Id.* at p. 31 (internal quotations & citations omitted).

- Ms. Barlow-Austin was finally taken to the medical office in a wheelchair on the morning of June 11, 2019. "Upon her arrival in the medical office, [Ms. Barlow-]Austin was 'confused and unoriented,' asking, 'Where am I? Why am I here?' She was begging for water but physically unable to hold a cup when one was handed to her. She was hypertensive and tachycardic—with a heartrate of 148 beats per minute. Her respiratory rate was abnormally low. The nursing staff was unable to draw blood because she had no 'visible veins,' indicating severe dehydration. She was visibly malnourished. Her

pupils were not reactive to light. The nursing staff finally decided it was time to call 911, and, shortly thereafter, responding medics transported her to the local emergency room via ambulance. 'By this time, [she was] beyond saving.'" *Id.*

- Ms. Barlow-Austin "didn't suddenly take a turn for the worse on the morning of June 11, 2019. Rather, [h]er medical condition warranted hospitalization *long* before then. By the time LaSalle finally arranged for her to be transported to the hospital, she had been complaining about increasingly severe symptoms for nearly two months. As set forth above, this included extreme headaches, nausea, vomiting, blurry vision, dizziness, fainting episodes (one of which led to a head injury), hypertension, severe neck pain, a large knot on her neck, and numbness in her legs. Over time, her blurry vision slowly transitioned to complete blindness, and the numbness in her legs slowly evolved from difficulty standing and walking to an inability to stand or walk. Weeks earlier, she presented with the hallmark symptoms of life-threatening meningitis, which was a known risk for her. Despite her alarming and progressively worsening symptoms, LaSalle never arranged to have her evaluated by a medical doctor." *Id.* at pp. 31-32 (internal citations & quotations omitted).

- Defendants Hill, Hughes, Jones, and Arnold were "gatekeepers at the jail." "Each of them engaged in conduct that knowingly put Ms. Barlow-Austin at susbtantial risk of serious harm and which caused or contributed to her unnecessary suffering and death." Each "purposefully omitted crucial information about her medical condition from their nursing notes." *Id.* at p. 33 (internal citations omitted).

*Id*. at pp. 3-7.

Based on these and other factual allegations, including the squalid condition of Ms. Barlow-Austin's foul-smelling medical observation cell, her urine-soaked clothing, her inadequate bedding, and her lack of food and water, the Magistrate Judge found sufficient evidence "to state a conditions of confinement claim, whether based on inadequate food, water, shelter, or medical care." R&R at p. 49. Although Nurse Defendants generally object to the Magistrate Judge's finding that Plaintiff's allegations can also properly be characterized as a condition of confinement claim, they do not specifically address many of the cases relied upon by the Magistrate Judge wherein a plaintiff's

22

allegations have been found to support such a claim. In addition to *Rodriguez v. Bexar Cty*., Civil Action No. SA-18-CV-248-XR, 2018 WL 4431433, at *3 (W.D. Tex. Sept. 17, 2018), which Nurse Defendants do address, the Magistrate Judge discussed a case from within this district where both a conditions of confinement claim and an episodic acts or omissions claim were submitted to the jury following trial.  R&R at pp. 40-41 & n. 15 (citing *Montano v. Orange County, Texas*, Civil Action No.1:13-cv-00611, 2015 WL 11110596, at * 3 (April 13, 2015 E.D. Tex.), *aff'd in part, vacated in part, remanded by Monato v. Orange County*, 842 F.3d 865 (5th Cir. 2016)).

In *Montano,* a pretrial detainee suspected of being intoxicated died of acute renal failure after being detained in an observation cell for over four days where he consumed little, if any, food or water, his vital signs were checked once at most, he was never seen by a physician, and emergency care was requested by the jail staff only minutes before his death.  *Montano*, 842 F.3d at 869.  The district court in *Montano* stated the case "presented a rare situation where Plaintiffs' allegations supported both a condition of confinement claim and an episodic acts or omissions claim." *Montano*, 2015 WL 11110596, at *3.  The court therefore submitted both types of claims to the jury. The jury answered a series of questions designed to determine whether the defendant was liable on one or more of three theories of liability (two of which were condition of confinement theories and one of which was an episodic acts or omissions theory).  *Id.* at *1. The jury found for the plaintiffs on one condition of confinement theory and the episodic acts or omissions theory and for the defendant on the other condition of confinement theory.  *Id*.

Addressing post-verdict the defendant's motion for judgment as a matter of law, the trial court, "in an extremely detailed and comprehensive opinion, ruled plaintiffs presented sufficient evidence to support the verdict on both the unconstitutional-condition-of-confinement claim and

survival damages, but insufficient evidence to support the verdict on the episodic-acts claim and wrongful-death damages." *Montano*, 842 F.3d at 872. District Judge Clark's Order Granting in Part Defendant's Motion for Judgment as a Matter of Law was appealed to the Fifth Circuit; however, the ruling against the episodic acts finding was not at issue on appeal. *Id.* The Fifth Circuit affirmed the jury's verdict and clarified that when there is "striking uniformity" in jail employees' testimony "further evidence [is] not required for a reasonable juror to infer a *de facto* policy for conditions or practices." *Id.* at 876. The Fifth Circuit stated "[j]urors heard consistent testimony that a given protocol was followed for every similarly-situated detainee." *Id.*

There is no indication the trial court in *Montano* erred in submitting both types of claims to the jury. As pointed out by the Magistrate Judge, the *Rodriguez* court also noted there is no rule barring a plaintiff from pleading conditions of confinement claims and episodic acts or omissions claims as alternative theories, and a court may properly evaluate each separately. R&R at p. 41 (citing *Rodriguez*, 2018 WL 4431433, at \*5 (citing *Estate of Henson*, 795 F.3d at 464) (construing the plaintiffs' allegations before the district court against a doctor as attacking episodic acts or omissions rather than conditions of confinement, but noting the plaintiffs claimed in the district court they had pleaded both an episodic acts and omissions case and a conditions case against the county)). The Magistrate Judge properly considered both theories in her R&R.

To the extent Nurse Defendants' generic objection attacks the sufficiency of the evidence to support a conditions of confinement claim, the Court finds instructive *Shepherd v. Dallas Cnty.,* 591 F.3d 445 (5th Cir.2009), another case mentioned by the Magistrate Judge. R&R at p. 46. In that case, a former pretrial detainee sued Dallas County after he suffered a stroke in the Dallas County Jail allegedly as a result of not receiving proper medication and medical attention. *Shepherd*, 591

F.3d at 449.  On appeal, the defendant unsuccessfully argued the plaintiff, who was challenging conditions of confinement, must prove intent, specifically, deliberate indifference. *Id*. at 454.

The Fifth Circuit affirmed the jury's verdict in favor of the plaintiff, holding the plaintiff properly presented a successful conditions of confinement claim. *Id.* The court emphasized the plaintiff's claim did "not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness." *Id.* The court stressed that the plaintiff "relied on evidence showing that the inadequate treatment he received in a series of interactions with the jail's medical system inevitably led to his suffering a stroke." *Id.* The court noted, however, that because "no single individual's error actually caused [the plaintiff's] hypertensive decline into a stroke," the district court was correct in granting summary judgment to the defendant on the plaintiff's episodic acts or omissions claim. *Id.* at 453 n. 2.

In *Shepherd,* the plaintiff indicted the entire jail medical system as a cause of his stroke. *Brown v. Bolin*, 500 Fed. Appx. 309, 313 (5th Cir. 2012) (citing *Shepherd*, 591 F.3d at 453). The jail had a history of problems "evaluat[ing], monitoring, and treat[ing] inmates with chronic illness ... due to poor or non-existent procedures and understaffing of guards and medical personnel [sic]." *Id.* Shepherd also presented independent evidence of the deficiencies including investigative reports from the county and Department of Justice and affidavits from employees of the jail and its medical contractor.  *Brown*, 500 Fed. Appx. at 313 (citing *Shepherd*, 591 F.3d at 456).

Similarly, in *Duvall v. Dallas County,* the plaintiff, who had contracted a severe infection that was resistant to typical antibiotic treatment, presented evidence that the jail had a "bizarrely high incidence" of the infection compared to other jails and that the county was aware of the problem, continued to house inmates in the face of the inadequately controlled infection, and knew how to

25

control the infection but failed to implement known measures to eradicate or control the situation. *Brown*, 500 Fed. Appx. at 313 (citing *Duvall*, 631 F.3d 203, 206 (5th Cir.2011)). Unlike in *Shepherd* and *Duvall*, the record in *Brown* lacked similar evidence of a systemic failure of emergency medical care at the Wichita County Jail. *Brown*, 500 Fed. Appx. at 313.  Therefore, the Fifth Circuit was persuaded the district court properly analyzed the *Brown* case as an episodic acts case.  *Id.*

Here, the Court is not convinced the record lacks allegations of a systemic failure of medical care of the type the Fifth Circuit has found to present an unconstitutional condition of confinement. Although the Fifth Circuit has not permitted plaintiffs to "conflate claims concerning a prison official's act or omission with a condition-of-confinement complaint," *see Anderson v. Dallas County Tex.*, 286 Fed. Appx. 850, 858 (5th Cir. 2008) the Court agrees with the Magistrate Judge this is one of the "rare cases" in which both claims, which can be alternatively pleaded, are supported at the Rule 12(b)(6) stage. *Montano*, 2015 WL 11110596, at *3.

Nurse Defendants claim that "some" of them "were not alleged to have participated in any acts or omissions that could form a pattern." Docket No. 49 at p. 3. In response, Plaintiffs argue as follows:

> [T]his ignores the fact that ***all*** of them participated in her grossly inadequate care summarized in the bullet points above, which took place over the course of *two months*. It also ignores the fact that Ms. Barlow-Austin spent much of her confinement in a 'medical observation cell,' located mere steps from the nursing station, making it reasonable to infer that they were all aware of her inhumane conditions of confinement. And the Second Amended Complaint plainly alleges that she was in that same filthy cell for *at least* a week—when she was malnourished, visibly emaciated, unable to walk, and completely blind—and that Defendants Hill, Hughes, Jones, and Arnold were each 'personally aware' of her condition but did nothing about it. As Judge Craven recognized, it would be inappropriate to dismiss Plaintiffs' claims at this stage of the litigation.

26

Docket No. 51 at p. 7 (citing R&R at p. 49).

The Court agrees that at the Rule 12(b)(6) motion to dismiss stage, Nurse Defendants' motion to dismiss any conditions of confinement claims should be denied. Accordingly, the Court overrules Nurse Defendants' first objection.

### *Episodic acts or omissions claims*

Regarding Plaintiffs' episodic acts or omissions claims, the Magistrate Judge "agree[d]" that the Second Amended Complaint "provides the Court with enough information to draw reasonable inferences in Plaintiffs' favor, 'using its judicial experience and common sense, and find that the factual allegations contained therein are sufficient to raise a reasonable expectation that discovery will reveal evidence of the claims alleged.'" R&R at p. 56. The Magistrate Judge also noted that jail death cases present unique factors for courts to consider in ruling on motions to dismiss. According to Plaintiffs, this includes Plaintiffs' assertion that the decedent in such cases is unable to provide "the dates and times of each encounter with each nurse," which creates an "asymmetry of information" that "weighs against dismissal under Rule 12(b)(6)." *See id*. (citing *Estate of Walter v. Corr. Healthcare Cos.*, 232 F. Supp. 3d 1157, 1164 n.5 (D. Colo. 2017)). The Magistrate Judge further noted Plaintiffs' assertion that jails are "sealed off from the public, 'making it difficult for surviving family members to obtain a complete set of records.'" *Id.*

In reaching her decision, the Magistrate Judge did not, as argued by Nurse Defendants,  "put aside" the allegations that took place between mid-April and June 8, 2019.  Rather, the Magistrate Judge determined that all the factual allegations contained in the SAC, along with reasonable inferences drawn therefrom, judicial experience, and common sense, were sufficient to support the

claims alleged. As noted by the Magistrate Judge, Ms. Barlow-Austin "did not suddenly take a turn for the worse during the last 48 hours of her confinement" and that she "was allegedly unable to walk and had vision loss weeks before then." *Id.* at p. 58.

The Magistrate Judge then addressed the last forty-eight hours, stating as follows: "*Even putting aside* the alleged misconduct between mid-April and June 8, 2019, the Court agrees with Plaintiffs [that] the allegations regarding [Ms. Barlow-Austin's] last few days of her confinement are sufficient to draw a plausible inference of deliberate indifference." *Id.* (emphasis added). In determining this, the Magistrate Judge did not discount the allegations regarding earlier events. Rather, she was noting Plaintiffs' allegation that the actions of the Nurse Defendants were "particularly abhorrent" during that timeframe because, by then, Ms. Barlow-Austin "was not only gravely ill, but she was also dehydrated and malnourished" and "so visibly emaciated that her bones were jutting out." *Id.*

Nurse Defendants focus on one sentence and argue there is only a "single specific allegation" pertaining to Defendants Hill and Arnold during that time, which is that on June 10, 2019, Defendant Jones notified Defendant Hill of Ms. Barlow-Austin's "abnormal behavior" and that Defendant Hill, in turn, notified Defendant Arnold of the situation. *See* Docket No. 49 at p. 5. According to Nurse Defendants, the Magistrate Judge did not discuss or consider how those "isolated allegations could amount to deliberate indifference." *Id.* However, according to Plaintiffs, these were not "isolated allegations" to be considered in a vacuum, and the allegations of misconduct between mid-April and June 8, 2019 provide valuable context for what happened in the last forty-eight hours. Docket No. 51 at p. 10 ("Indeed, as the Report and Recommendation makes clear, each of the Nurse Defendants was 'personally aware' that by early June, 'Ms. Barlow-Austin was physically disabled, unable to

28

walk, and completely blind.'" (quoting R&R at p. 26)).

> The Magistrate Judge further stated as follows:
>
> Despite their 'personal knowledge' of these 'alarmingly serious medical needs,' these defendants (and others) 'failed to conduct their required visual checks, failed to follow healthcare protocols, failed to document their patient's highly abnormal medical signs and symptoms, failed to keep honest and accurate medical records, failed to administer essential doses of medication, failed to communicate among one another about their patient, failed to report her severe medical needs to higher-level providers—in dereliction of their gatekeeping duty—and failed to call 911 or otherwise secure timely hospital transport.'

*Id.* These allegations are sufficient to support a plausible claim of deliberate indifference.

The Court agrees with the Magistrate Judge that Nurse Defendants' motion to dismiss any episodic acts or omissions claims should be denied. Accordingly, the Court overrules Nurse Defendants' second objection.

### *Qualified immunity*

Finally, Nurse Defendants contend the Magistrate Judge erred by not finding they are entitled to assert qualified immunity. Nurse Defendants attempt to distinguish the recent Fifth Circuit case relied upon by the Magistrate Judge, arguing an analysis of each of the delineated purposes of qualified immunity weigh in favor of extending the availability of qualified immunity to Nurse Defendants. According to Nurse Defendants, they are entitled to qualified immunity against the claims asserted against them in this litigation. The Court disagrees.

The United States Supreme Court has held that employees of private corporations that run prisons for a profit and with "limited direct supervision by the government" are not entitled to qualified immunity. *See Richardson v. McNight*, 521 U.S. 399, 413 (1997). Earlier this year, the

Fifth Circuit, applying *Richardson*, denied qualified immunity to employees of a private corporation that provided correctional healthcare services in a Texas jail run by Bell County. *See Sanchez v. Oliver*, 995 F.3d 461, 466-72 (5th Cir. 2021). In their objections, Nurse Defendants claim that unlike the private correctional corporations in *Richardson* and *Oliver*, LaSalle runs the jail under "direct and substantial supervision by local and state authorities." Docket No. 49 at p. 8. According to Plaintiffs, this argument is contradicted by the plain language of LaSalle's contract with Bowie County. Docket No. 51 at p. 12.

Pursuant to the contract, LaSalle independently managed the Bi-State Jail without direct supervision by the government. As the Magistrate Judge recognized, LaSalle had "full control" over the Bi-State Jail since February 2013—when it signed a contract with Bowie County.[4] R&R at p. 35. Under the contract, "LaSalle agreed to 'operate, manage, and supervise' the Bi-State Jail and to 'receive, detain, and care' for all inmates." *Id.* (quoting Docket No. 27, Ex. A at 1 § 1.06). "The contract required LaSalle to 'manage, operate, and provide,' among other things, equipment (e.g., televisions, radios, phone systems), food and beverage services, uniforms for officers and inmates, accounting services, security services, medical care, and 'all other services' necessary for the jail's operation." *Id.* (quoting Docket No. 27, Ex. A at pp. 4-6 § 4.01).

According to Plaintiffs, Bowie County maintained no control over policies and procedures, pointing out the contract mandated that LaSalle "prepare and adopt" its own procedural manual for

---

[4] "The contract was awarded to LaSalle after a competitive bidding process in which Bowie County issued requests for proposals and solicited bids from private correctional corporations." R&R at p. 36. "The term of the contract was three years, subject to periodic yearly renewals thereafter." *Id.* Because the county had no role in the management, operation, and supervision of the jail, "LaSalle agreed to indemnify and hold the county harmless from all claims, expenses, damages, liabilities, and costs arising from LaSalle's jail operations." *Id*. at p. 37 (quoting Docket No. 27, Ex. A at pp. 7, 9-10 §§ 4.06 & 8.01).

the jail's operation. *Id.* (quoting Docket No. 27, Ex. A at p. 8 § 6.01). Plaintiffs assert there were no

governmental employees at the Bi-State Jail—everyone from the warden to the front-line corrections

officers were LaSalle employees. According to the contract, LaSalle was solely responsible for

"'interviewing, hiring, training, assignment, management, compensation, promotion, and termination

of all members'" of the jail's administration and staff. *Id.* (quoting Docket No. 27, Ex. A at p. 7 §

4.07). Bowie County had no role in day-to-day facility operations.

While the Bowie County Sheriff would "periodically monitor" the jail's operation, *see*

Docket No. 27, Ex. A at p. 11 § 10.2, he did not *directly* supervise LaSalle. *See id.* at p. 1 § 1.01, pp.

4-6 § 4.01, 7 § 4.07. As the Magistrate Judge correctly noted, "[t]he contract makes clear that

LaSalle was an '*independent* operator' and 'not a partner or joint venturer' of the county." R&R at

pp. 36-37 (emphasis added) (quoting Docket No. 27, Ex. A at p. 2 §§ 1.03 & 1.05). Under the

express terms of the contract, the Bi-State Jail was completely privatized—run entirely by LaSalle.

LaSalle argues the county sheriff was "statutorily required to 'continue to exercise

supervision and control over the facility.'" Docket No. 49 at p. 8 (citing Tex. Loc. Gov't Code Ann

§§ 351.103(2) & 351.041(b)). In response, Plaintiffs argue there is no evidence that he supervised

day-to-day jail operations, maintained a regular physical presence at the jail, or managed LaSalle

personnel. According to Plaintiffs, to the extent the sheriff's level of supervision could be construed

as "direct," it was, at most, "limited direct supervision." Docket No. 51 at p. 13 (citing *Ace Bev. Co.*

*v. Lockheed Info. Mgmt. Servs.*, 144 F.3d 1218, 1219-20 (9th Cir. 1998) (rejecting private parking

management operator's argument that it was under "close supervision" by the government because

the city set policy and monitored the company's performance and finding that this was "exactly" the

type of "limited direct supervision that the Supreme Court found inadequate to confer qualified

immunity" in *Richardson*.)).

 Additionally, Plaintiffs assert as follows:

 In addition to LaSalle's lack of substantial *direct* governmental supervision, there is no historical or common law tradition of affording immunity to privately employed prison or jail employees. *See Richardson*, 521 U.S. at 405; *Oliver*, 995 F.3d at 469. Moreover, the policy considerations that led the Supreme Court and the Fifth Circuit to reject qualified immunity for employees of private correctional corporations compel the same result for LaSalle's employees. In every material respect, LaSalle's situation was identical to the private correctional corporations in those cases. Like those corporations, LaSalle was awarded the contract after a competitive bidding process. Like those corporations, LaSalle's contract was for 'three years,' subject to yearly renewals. Like those corporations, LaSalle operated in a marketplace with pressure from competing firms seeking to take over the contract. Like those corporations, LaSalle was required to maintain substantial liability insurance—enabling it to indemnify its employees. Like those corporations, LaSalle agreed to indemnify and hold the county harmless for all claims arising from its private jail operations. And like those corporations, LaSalle had access to risk management and legal teams to mitigate the impact of litigation. The only difference is that *unlike* the private corporation in *Oliver*, LaSalle's staff did not work alongside county employees. Thus, in LaSalle's case, there was no threat of public employees being distracted by lawsuits.

 In sum, there is no way to read *Richardson* and *Oliver*, in good faith, and conclude that somehow LaSalle's employees are entitled to special protection that was not available to the private employees in those cases.

Docket Entry # 51 at pp. 14-15 (emphasis original).

 The Court, having carefully considered the objections and the response thereto, agrees with the Magistrate Judge that "Nurse Defendants, as employees of a private firm systematically organized to perform the major administrative task of delivering medical services to pretrial detainees, are categorically ineligible to claim qualified immunity." R&R at p. 64. The Court overrules Nurse Defendants' third objection.

**LaSalle Defendants' motion**

The Magistrate Judge also recommended LaSalle Defendants' motion to dismiss for failure to state a claim be denied.  R&R at pp. 64-76. In their objections, LaSalle Defendants argue as follows:

> Without delineating between claims for wrongful death claims and substantive due process claims, the Report concluded that it was sufficient for Plaintiffs to simply cite Section 1983 to assert wrongful death claims. However, the Report does not consider the differences between claims for damages under a state wrongful death statute with independent, substantive due process claims for violations of liberty interests, which is the critical distinction at the heart of Defendants' argument. Specifically, while the plaintiffs may have asserted claims arising under the Texas wrongful death statute, any remaining independent claims for substantive due process violations by Mary Mathis and Michael Austin should be ripe for dismissal to the extent those claims are asserted in the SAC.
>
> In other words, even assuming that the plaintiffs have adequately pled wrongful death claims in their SAC, their purported independent substantive due process claims are ripe for dismissal for the same reasons as the Northern District of Texas recently found in *Dyer v. City of Mesquite*. In *Dyer*, the court recognized the distinction between these two causes of action and dismissed the substantive due process claims of parents for the loss of companionship of their son who died in state custody. Importantly, the court observed that 'the Fifth Circuit does not appear to have decided this question' and adopted a widely-followed Seventh Circuit decision in *Russ v. Watts* that held that parents had 'no constitutional right to recover for the loss of the companionship of an adult child when that relationship was terminated as an incidental result of state action.' While the Magistrate Judge's Report found that a wrongful death claim was adequately pled, the Report did not address the plaintiffs' substantive due process claims related to their liberty interests which are not recognized in the Fifth Circuit. Accordingly, plaintiffs' claims for their familial liberty interest in their relationship, society and companionship with Austin should be denied, even if this Court ultimately finds that the plaintiffs have adequately pled a separate claim for wrongful death.

Docket No. 49 at pp. 14-15 (internal footnotes omitted).

According to Plaintiffs' response, LaSalle "Defendants appear to concede [the Magistrate

Judge was correct] but argue that Judge Craven should have specifically addressed Plaintiffs' substantive due process claims." Docket No. 51 at p. 15, n. 8. Plaintiffs state whether the Court chooses to specifically address this issue is immaterial to the outcome because the exact same damages are available under the alternative theory that Plaintiffs adequately plead. *Id.*

The Court has conducted a *de novo* review of the Magistrate Judge's findings and conclusions and finds they are correct for the reasons stated by the Magistrate Judge. The Court finds the Magistrate Judge was correct in determining that Plaintiffs adequately plead loss of relationship-type damages under § 1983 and are not required to assert a supplemental state law claim to seek such damages. Accordingly, LaSalle Defendants' objections are overruled.

**LaSalle Management's motion**

The Magistrate Judge also recommended LaSalle Management's motion to dismiss for failure to state a claim be denied.  R&R at pp. 76-89. In their objections, LaSalle Management contends Plaintiffs "failed to state a claim against LaSalle Management because the bare-bone allegations focus only on the parent-subsidiary relationship between the entities and contain conclusory allegations against the 'Corporate Defendants' without alleging sufficient factual allegations to hold the parent company liable for allegations against the subsidiary company." Docket No. 49 at p. 12. LaSalle Management asserts the Magistrate Judge erred by relying upon allegations of other incidents referenced in the SAC. However, LaSalle Management does not specifically address any of the evidence or specific findings of the Magistrate Judge.  The Court finds LaSalle Management's objection without merit.

The Court is of the opinion the findings and conclusions of the Magistrate Judge with respect

to LaSalle Management's motion to dismiss are correct.  Accepting all well-pleaded facts as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs have stated a plausible claim against LaSalle Management.

## CONCLUSION

The Court is of the opinion the findings and conclusions of the Magistrate Judge regarding Defendants' motions to dismiss are correct.  Therefore, the Court adopts the findings and conclusions of the Magistrate Judge as the findings and conclusions of this Court.  Based on the foregoing, it is

**ORDERED** that Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim by Southwestern Correctional, LLC D/B/A/ LaSalle Corrections; LaSalle Management Company, LLC, Bowie County, Texas; Amanda Hughes, Markesha Jones, Tiffany Hill, Brittany Cooksey and Michelle Arnold (Docket No. 20) is **DENIED**. It is further

**ORDERED** that  Motion for Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim and Qualified Immunity by Amanda Hughes, Markesha Jones, Tiffany Hill, and Michelle Arnold (Docket No. 21) is **DENIED**. It is further

**ORDERED** that Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim by LaSalle Management Company, LLC (Docket No. 22) is **DENIED.**

**So ORDERED and SIGNED this 10th day of September, 2021.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE